# EXHIBIT 16



**MERCED COUNTY DISTRICT ATTORNEY**
**BUREAU OF INVESTIGATIONS**

*CASE REPORT – SUPPLEMENTAL 04*

DISTRICT ATTORNEY
Larry D. Morse II
CHIEF INVESTIGATOR
Patrick N. Lunney

550 W. Main Street
Merced, CA 95340
Tel: (209) 385-7381

## CASE INFORMATION

| | | | |
|---|---|---|---|
| **CASE NAME:** | Daniel Bong Yoon Sr | **INV CASE NUMBER:** | 481992 |
| **CASE TYPE:** | Embezzlement | **RELATED CASE NUMBER:** | |
| **JUVENILE CASE:** | N/A | | |
| **ARREST DATE/TIME:** | | **REPORTING OFFICER:** | Anna Hazel DA43 |
| | | **REPORT DATE:** | 10/23/2015 |
| | | **APPROVED:** | *Sup. Invst. Wayne Hutton – DAI2* |

## VIOLATIONS

| VIOLATION: | TYPE: | DATE AND TIME OCCURRED: | DATE AND TIME REPORTED: | LOCATION: |
|---|---|---|---|---|
| PC504 | F | 10/16/2014 TO | 10/23/2014 | |

## INVOLVED PARTY

| TYPE: | NAME: | RACE: | SEX: |
|---|---|---|---|
| Witness | Robert Deklinski | W | M |
| ADDITIONAL INFORMATION: | | | |
| Other | Joseph Doerr Esq | | M |
| ADDITIONAL INFORMATION: | | | |
| Witness | Blair Erica | W | F |
| ADDITIONAL INFORMATION: | | | |
| Reporting Officer | Anna Hazel | | F |
| ADDITIONAL INFORMATION: | | | |
| Witness | Brian Johnson | W | M |
| ADDITIONAL INFORMATION: | | | |
| Witness | Hyun "Harry" Kim | K | M |
| ADDITIONAL INFORMATION: | | | |
| Reporting Party | John Yoon | K | M |
| ADDITIONAL INFORMATION: | | | |

This e-copy is the official court record (GC68150).

This e-copy is the official court record (GC68150).

## MERCED COUNTY DISTRICT ATTORNEY
### BUREAU OF INVESTIGATIONS

*CASE REPORT – SUPPLEMENTAL 04*

**CASE NAME:** Daniel Bong Yoon Sr

**INV CASE NUMBER:** 481992

### SUSPECT(S)

☐ Unknown

**NAME:** Daniel Bong Yoon Sr
**DATE OF BIRTH:** 08/19/1949
**AGE:** 66
**RACE:** A
**SEX:** M
**HEIGHT:** 6'06
**WEIGHT:** 160
**HAIR:** BK
**EYES:** BR

**ADDRESS:** 11933 Dublin Canyon Rd, Pleasanton CA 94588
**PHONE:**
**DRIVER'S LICENSE:** CA N94094453

**ALIASES:** Daniel Bong Boon Sr
**ARRESTED:**

**SSN:**
**STATE ID:**

**CLOTHING, DESCRIPTION, TATTOOS, OTHER I.D.:**

### NARRATIVE

**BBCN xx0101 – KS AVIATION dba: SIERRA ACADEMY (2012)**

After careful review of all BBCN bank statements for KS Aviation account ███ for the period 2009-2014 obtained by request from Sierra Academy personnel or by search warrant, I realized that statements for 2012 had been omitted. On 09/14/15 I requested, and on 09/18/15, I received from Sierra Academy a binder containing the BBCN statements for account ███ for 01/12 – 12/12 (*ref: Atch. 1*). The period of 2012 was particularly concerning to me in light of Daniel Yoon's opposition to the preliminary injunction he filed against John Yoon on 06/30/15. In that document (*ref: Atch. 2*), Daniel indicated that from 2004-2015 he had invested over $1,000,000 of personal funds and/or funds of his restaurant businesses into Sierra Academy. He specifically stated in one example that "In order for KS [Aviation] to make ends meat [sic], I had to sell a home that I owned in San Ramon, 9452 Thunderbird Place, San Ramon, California. The sale was for $770,000 and that money was put into KS Aviation." When I conducted a search for the sale history for that property, I found that it was last sold by Daniel & Jeenee Yoon on 04/12/12 for $750,000 (*ref: Atch. 3*).

When I examined the 2012 statements, I found that in 01/12, Sierra Academy had a checking account balance of just over $1,000,000. In that month there were just over $189,000 in deposits but more than $818,000 in debits to the account. The amounts of the monthly deposits and debits varied greatly over the year with monthly deposits ranging from $150,000 - $900,000 and debits ranging from $350,000 - $800,000. What was clear was that Sierra Academy was regularly making monthly payroll, covering operating costs and paying on outstanding debt each month, often with a surplus. It did not appear that Sierra Academy was experiencing "financial trouble" insofar as they maintained a positive balance in this account each month and did not appear to have difficulty paying employees or regular vendors.

Given Daniel's statement in his opposition to the court on behalf of the lawsuit filed against him, I looked closely at the deposits to this account that occurred after the sale of Daniel's home in San Ramon. I found that all deposits to this account by check or incoming wire were made by various airlines, individuals (student payments) or refunds from various vendors. I found no deposit that indicated over $700,000 in proceeds from the sale of any property (i.e. wire transfer from bank, lender or escrow company) had been deposited at any time during that year. Further, I found only two cash deposits to this account in 2012, both for $4,606.50 occurring in 01/12 and 03/12. Based on my review of these

**MERCED COUNTY DISTRICT ATTORNEY**
**BUREAU OF INVESTIGATIONS**

*CASE REPORT – SUPPLEMENTAL 04*

CASE NAME: Daniel Bong Yoon Sr      INV CASE NUMBER: 481992

bank records, there is no evidence that the proceeds from this sale had been deposited to either the Sierra Air Center BBCN account ███ or the Sierra Academy Westamerica account ███

What was evident by the 2012 statements was that Daniel had continued to use the Sierra Academy account to pay expenses related to his restaurant businesses and to finance his "everyday" spending at various Bay Area restaurants, retail stores, country clubs, gas stations and grocery stores. Numerous checks written by Daniel out of the Sierra Academy account were to contractors previously noted to have performed work for the building/renovation of Daniel's Hana Japan Steakhouse restaurants in Dublin and Berkeley, CA. Many of the check memos specifically noted that they were for "Hana Japan."

| DATE | CHECK # | CHECK AMT | PAYEE | PAYER | MEMO |
|---|---|---|---|---|---|
| 11/16/11 | 20269 | $1,949.00 | Debolt Engineering | Daniel Yoon | |
| 01/12/12 | 20684 | $5,575.00 | Acies Engineering | Daniel Yoon | "Hana Japan" |
| 01/12/12 | 20685 | $3,750.00 | Hohnback Lewin Inc | Daniel Yoon | "Hana Japan" |
| 01/12/12 | 20686 | $6,363.26 | William Wood Architect | Daniel Yoon | "Hana Japan" |
| 01/31/12 | 20812 | $2,405.00 | Debolt Engineering | Daniel Yoon | |
| 02/28/12 | 21026 | $5,055.00 | Debolt Engineering | John Yoon | |
| 03/27/12 | 21244 | $164,182.87 | City of Pleasanton | Daniel Yoon | "Hana Japan" |
| 03/29/12 | 21257 | $3,972.50 | Debolt Engineering | Daniel Yoon | |
| 03/29/12 | 21259 | $12,260.63 | Acies Engineering | Daniel Yoon | "Hana Japan" |
| 03/29/12 | 21261 | $4,554.00 | Borrecco-Killian Assoc. | Daniel Yoon | |
| 03/29/12 | 21260 | $450.00 | GFK & Associates | Daniel Yoon | |
| 06/01/12 | 21717 | $4,170.45 | William Wood Architect | Daniel Yoon | "Hana Japan" |
| 06/01/12 | 21716 | $6,223.00 | Debolt Engineering | Daniel Yoon | |
| 06/15/12 | 21820 | $189.37 | Acies Engineering | Daniel Yoon | "Hana Japan" |
| 09/14/12 | 22454 | $5,500.00 | CND Construction | Daniel Yoon | |
| 09/26/12 | 22590 | $1,430.00 | CND Construction | John Yoon | |
| 11/05/12 | 22828 | $3,029.15 | City of Pleasanton | Daniel Yoon | |
| 11/29/12 | 23049 | $1,800.00 | CND Construction | Daniel Yoon | |
| 11/29/12 | 23052 | $2,750.00 | Stevens Engineering | Daniel Yoon | |
| 12/14/12 | 23201 | $977.76 | William Wood Architect | Daniel Yoon | "Hana Japan" |
| 12/14/12 | 23200 | $1,284.00 | Borrecco & Killian Assoc | Daniel Yoon | |
| **TOTAL:** | | **$237,870.99** | | | |

Despite no evidence that Daniel had deposited any of his own money to Sierra Academy in 2012 as he had claimed, he was responsible for the diversion of an additional $237,870.99 of Sierra's funds to use by his restaurant businesses in 2012. Further, I also noted two payments made from Sierra's BBCN ███ account to a "Nara" (BBCN) account ███ for $90,000 each on 12/30/11 and 09/18/12. There were also regular monthly payments from Sierra to this same account for $6,056 which would suggest it was some type of installment loan or credit account. This is a BBCN account not previously known to this investigation and not identified in returns made by BBCN for the search warrant
This e-copy is the official court record (GC68150).

addressed to KS Aviation, Inc. simply stated "The undersigned hereby resigns as President of the above-referenced corporation effective immediately." John stated that since the resignation was offered and accepted, he had not seen or spoke with Daniel and operations at Sierra Academy had begun to take on a sense of normalcy. John stated that he was quickly and successfully addressing pertinent issues that Daniel had neglected in an effort to right the many "wrongs" Daniel had created. John stated that he had met with the EEOC regarding a two year old personnel complaint involving Daniel's illegal firing of a pregnant Sierra Air Center mechanic. At that meeting John, the former employee and representatives of the EEOC quickly worked out a settlement that was agreeable to all parties and the case was resolved. There are several other personnel complaints still pending. John also stated he has met with representatives of Boeing regarding the training program on the 737 simulator that has yet to be implemented. He also recently traveled to China to meet with airline representatives and the CAAC (the Chinese equivalent of the FAA) to assure them that operations at the Academy were running smoothly and that he had resumed control of the company.

Despite Daniel's resignation in 08/15, it appeared from additional documents that John provided to me that he continued to manipulate the operations of Sierra Academy by creating documents that appeared to have no legal basis. For instance, as previously mentioned in this report, Daniel had given Sierra Academy notice that he was owed over $1,000,000 for "unpaid compensation." The document, which John provided a copy of, was a "Minutes of Special Meeting of Board of Directors" and purports to document a meeting that occurred at the KS Aviation Atwater office on 12/20/14. The document clearly states that Daniel Yoon was the only director present and that he was serving as Board Chairman, President of the Corporation and Secretary of the Corporation. The only item addressed at the meeting was the issue of unpaid compensation to "CEO Dan Yoon for the period Jan 2004 through Dec 2014." A motion was "duly made, seconded and unanimously carried" by Daniel it is presumed as no one else was documented as present, that KS Aviation pay Daniel $1,080,000 and record it as "a special bonus in 2015." Daniel Yoon signed the document and dated it "2/20/2014" which was likely an omission of the number one in the month.

John also provided a copy of "Minutes of the Annual Meeting of the Shareholders of KS Aviation, Inc." dated 09/01/15. The document indicated the meeting took place at KS Aviation offices "for the purpose of electing a new Board of Directors..." It stated that the only shareholders present were Daniel and his son Jong-Ki Yoon who held shares of 1,950,435 and 100,000 respectively. Also present were Cyril Lawrence and Joseph Doerr. It was stated that Daniel nominated himself, John Yoon and Charlie Choi Ho as Directors for a term of one year. The nomination was "unanimously" passed. The document also stated that no President's Report was provided because John Yoon was absent "without reason." Although not expressly stated in these minutes or on any other document I reviewed, this statement indicated to me that it was assumed that John Yoon had been recognized as President by the "board" after Daniel resigned in 08/15. When I asked John who Charlie Choi Ho was he stated that he was a "friend" of Daniel's. John stated he did not attend the meeting on advice from corporate counsel Doerr that he was not needed at the meeting.

After this annual meeting of "shareholders," notice of a Board of Directors Meeting was sent by Lawrence to Daniel, John, Choi Ho and corporate attorney Doerr on 09/24/15. The notice indicated the meeting would be held on 10/02/15 at the KS Aviation offices and an agenda was attached. The agenda listed just three items for discussion which included the "status of the 2014/2015 taxes," "status of current litigation" and "status of $200,000 line of credit." The same day, John sent a letter to Lawrence advising him that Sierra Academy's 2014 taxes had been filed and that his legal services as

corporate counsel to Sierra Academy would no longer be needed. John explained that Lawrence had been counsel for Sierra for some time and had handled several legal matters for them. However, John knew that Lawrence was now representing Daniel personally in the civil suit John had filed and felt that this now created a conflict of interest for Lawrence. John stated that he did not attend any meeting on 10/02/15 at KS Aviation offices and was not aware a meeting ever took place. He stated that he believed Daniel had only tried to come onto the property once since resigning and when he was asked to leave he complied. He has not seen Daniel on the Academy property and would not have allowed any meetings involving Daniel on the premises. Nevertheless, on 10/05/15, staff at Sierra Academy was given a "Memo to Employees" signed by Jong-Ki Yoon, "Secretary of KS Aviation" (a title numerous other documents indicated belonged to Daniel) that stated "upon resolution by the Board of Directors at a specially called meeting" (later indicated as the meeting of 10/02/15). John Yoon was being removed as President and "shall not be allowed on the premises without receiving prior permission from the new President of KS Aviation, Inc." The document stated that position was offered to Ken Kwon who accepted and "shall be responsible for all operations answerable to the Board of Directors." The memo also stated that Brian Johnson was being terminated "for cause." John believes that Daniel will maintain control over Sierra essentially by proxy through Kwon. John stated there were additional documents Lawrence personally gave him on 10/05/15 that he failed to bring with him and would email them to me after our meeting concluded. John stated that he remains baffled at how such things could be allowed to occur as it appeared obvious that most if not all of the documentation used to play these "games" was fabricated or forged by Daniel for his own benefit. Yet, these same documents were being relied upon to effectively remove him from the company he founded by a former partner who had voluntarily resigned months prior.

John stated that Monday's events have effectively grounded all aviation operation at Sierra Academy. Brian Johnson was the Chief Pilot for the Academy and with respect to particular aircraft the only instructor allowed to sign off on a student's proficiency. There are students currently at the Academy that will be unable to graduate due to this. John is extremely concerned about how the FAA will handle this matter as there is a pending inspection and he can't see how the Academy could pass given the current situation. Sierra's certification with the CAAC is also coming up and with the installation of a new President and firing of the Chief Pilot it is likely that the Academy will not be re-certified for training of foreign students. Further, John stated that the Academy's relationship with Boeing is now in jeopardy as the current agreements in place were made with Daniel and John and they have no knowledge of or relationship with Kwan.

Later on 10/07/15, John emailed the letter he received from Ken Kwan on 10/05/15 that noticed him of his termination. Kwan signed the letter as "President" of KS Aviation on behalf of the Board of Directors (*ref: Atch. 5*). Included was a one page "Action Taken Board of Directors of KS Aviation, Inc. Consent with a Meeting" signed by Daniel 10/02/15 which stated that "by unanimous written consent <u>without</u> a meeting pursuant to California Corporations Code Sections 603 and of the Corporation, hereby adopt the following Resolutions:

> ***RESOLVED, that the company will terminate John Yoon as President of the Corporation for cause effective October 2, 2015."***

This e-copy is the official court record (GC68150).

Case: 20-04021   Doc# 273-20   Filed: 04/12/24   Entered: 04/12/24 17:27:21   Page 6 of 14

In reviewing all of the documentation John presented, it appeared to me that while Daniel had effectively resigned as President of KS Aviation on 08/12/15 he was still using his self-appointed position as Chairman of the KS Aviation Board of Directors to take action against John and Sierra Academy.

The documents appeared much like the previous minutes, memos and letters I have reviewed during the course of this investigation. They purport to be authoritative in some regard but are based on the actions of one person, Daniel, or an ever changing Board based on Daniel's fraudulent appointments of friends or family members. It appeared to me that there is some notion on Daniel's part that, if it is written down, signed and dated than it is actionable and legal.

### JOSEPH DOERR, ESQ. – McCORMICK & BARSTOW

On 10/07/15, I spoke with Joseph "Joe" Doerr who John indicated had recently been hired as corporate counsel by KS Aviation. Doerr stated that his status as corporate counsel was somewhat uncertain as he had been hired by John after Lawrence had been fired by KS Aviation for obvious conflict of interest issues related to the civil suit John filed against Daniel. Doerr stated that in the same 10/02/15 Board meeting that Daniel supposedly held where it was decided that John and Brian Johnson would be fired, it was also decided that he would be fired as corporate counsel. Doerr agreed he did not believe the meeting was valid or the action taken legitimate, however, he has contacted Lawrence regarding the issue and Lawrence, who is still named as counsel of record in several pending personnel lawsuits brought against KS Aviation, refused to step down. This meant that Lawrence, who represents Daniel Yoon in the civil suit filed against him by John Yoon with regard to Daniel's actions at KS Aviation continues to represent KS Aviation in other civil matters pending against them as a result of Daniel Yoon's action as President/CEO/CFO despite the corporation's wishes to remove him.

### CORRESPONDENCE FROM SIERRA EMPLOYEES

After the events of 10/05/15, I began receiving frequent emailed correspondence from Robert Deklinski, Joshua Daniels and Erica Blair as to the daily situations being faced by employees under the new administration (*ref: Atch. 6*). As of 10/08/15, John Yoon's company issued cell phone had been disconnected and Blair reported that Daniel was still authorizing electronic fund transfers from the Sierra BBCN account ████████ for the payment of both the company credit cards and a Capital One credit card not issued by Sierra. Deklinski also reported that even after Daniel's resignation as President Daniel had met with him and told him that he would still be traveling abroad on behalf of Sierra Air Center Development Center (EB-5 Program) and was planning to return to China in a couple of weeks. Employees stated that just days after Kwan was installed as President, as they expected, Daniel had been back to the offices and was seen "setting up his office" in the accounting department.

I was informed on 10/13/15 that John Yoon's civil attorney's filed a motion for an injunction and requested a temporary restraining order be issued against Daniel Yoon. A court hearing was held on 10/14/15 where the judge denied the motion for the injunction and set a trial date in November on the civil suit pending. According to John, however, some of the operational matters brought before the judge were decided, albeit temporarily, until the trial date. Specifically, as to matters concerning the use of Sierra's business banking accounts, BBCN had "frozen" the accounts because of the obvious conflicting information they were receiving about "ownership" of the accounts and recognized authorities on

the account. It had been previously agreed with BBCN that any transaction over $5,000 would be authorized by both Daniel and John, however, Daniel continued to contact BBCN to issue wires and transfers of over $5,000 without approval by John. This caused BBCN to "freeze" the accounts for violation of the agreed upon arrangement. Judge Proetti, in hearing the motion on the injunction did issue rulings that Kwan was not to sign any checks from Sierra's accounts and that an agreed upon third party CPA would be brought into the situation to be the sole signer of checks from these accounts until the case was further resolved. John stated that the day after the hearing, BBCN contacted him again to report that Daniel had attempted to have his son, Jong Ki and Ken Kwan added as signatures on Sierra's BBCN accounts. Also, on 10/16/15, Jong-Ki and Kwan went to Blair and requested two checks be drawn up, for $5,000 each payable to Mason, Robbins, Browning & Godwin, attorney's working for Daniel Yoon. Blair refused, recognizing the splitting of the two checks was in an attempt to keep the total amount under $5,000 and she had not received approval from Daniel or John to issue the checks. Jong-Ki and Kwan then took two blank checks and hand wrote them payable to the law firm. Blair expected that Daniel was to ultimately sign the checks but I cannot confirm that until the bank statements showing the copies of paid checks for 10/15 are mailed to Sierra in 11/15. I was provided with the "stubs" of those checks which indicated they were check #'s 33513 and 33552.

As of 10/21/15, employees were reporting that Daniel was present at Sierra and interacting with employees "on a daily basis." Although he resigned in 08/15 and orchestrated the installation of Kwan as President of the company in 10/15, by all appearances, Daniel is once again responsible for the daily operation of the company. This has caused employees to become very nervous and fearful as dozens have filed harassment, verbal and physical abuse complaints with both the human resourced department at Sierra Academy and with the Merced County Sheriff's Office against Daniel over the course of the last year and do not want to return to an environment where they are subjected to such abuse.

### CHASE SOUTHWEST RAPID REWARDS CREDIT ACCOUNT ████ AND ████

On 10/09/15, I received returns on a search warrant served on Chase Card Services on 07/21/15 for statements pertaining to credit accounts held by Daniel Yoon and/or Sierra Academy (*ref: Atch. 7*). The returns included statements (01/01/14 – 07/15/15) for a Southwest Rapid Rewards card ending ████ in the name of "Dan Yoon" which was transferred to a card ending ████ in 09/14. The account had an initial credit limit of $25,000 which was increased to $30,000 in 03/14 and to $36,000 in 10/14. The average balance on this card in 2014-2015 was approximately $17,500 with some months having a balance of just a couple hundred dollars (i.e. 02/06/15 balance was $280.65) to other months exceeding the credit limit by thousands (i.e. 09/06/15 balance was $45,633.24). Payments to this account were made using checks drawn on KS Aviation BBCN account ████ or by automatic debit to the same account using "Chase ePay."

I analyzed the statements in terms of "categorical" spending and found that charges that appeared to be business related (i.e. vendor was related to avionics; business supply; IT networking/website etc) exceeded $240,000 in the 21 months reflected in these statements. Over $190,000 in charges were related to travel expenses (i.e. airline tickets, hotels, rental cars etc) incurred by Daniel Yoon. I found that the charges indicated that Daniel traveled at least once per month to both international and domestic locations. Charges during these same 21 months were recorded in Miami, Las Vegas, Texas, China and Korea. Although allegations by John Yoon which were supported by statements given by other employees at Sierra Academy included suspicion that Daniel was using company funds for personal travel, I confirmed

with Erica Blair that Sierra Academy kept no records of meetings, conferences or seminars that Daniel attended to be able to decipher whether or not the travel expenses noted on this (or any other account) for a given month would have been related to a legitimate business purpose.

Retail spending on this account exceeded $40,000 for the period and included numerous charges at Amazon.com, Best Buy, Wal Mart, Target, CVS Pharmacy and various grocery stores both in Merced/Atwater as well as Dublin and Pleasanton. Again, without specific receipts and/or invoices from these retailers, I am unable to determine if any or all of the purchases were for personal use as items sold in these stores vary and could have been supplies, equipment or necessities for students, staff or office use. However, I did note that Daniel had retail purchases as Coach, Kate Spade, Men's Wearhouse, Nordstrom, Zumiez and Aldo which are retailers that specialize in designer bags/purses, clothing and shoes. It did not seem likely that purchases at these retailers were for business use and amounted to just under $3,000 in charges.

Both John Yoon and Erica Blair offered in their statements that they knew Daniel had used Sierra Academy funds to pay for expenses related to Daniel's two Bay Area restaurants. In his initial correspondence, John provided copies of checks that Daniel had written on KS Aviation accounts to various contractors, engineers, architects and vendors which referenced "Hana Japan" the name of Daniel's steakhouses. In 01/15 dozens of charges payable to the cities of Livermore and Berkeley were charged to Daniel's Southwest credit card. All totaled, the charges amounted to over $5,000. As Sierra Academy does not operate out of those cities or have other business ventures tied to those cities, I believe these charges were likely associated with Daniel's restaurants and fees, fines or taxes he owed to those cities.

In 12/14, I noted that Daniel used the Southwest card to make a tax payment of $14,000 to the IRS. I was not aware from any previous documentation reviewed that KS Aviation or any of its subsidiaries had any outstanding tax liabilities due in 12/14 and further, in my review of the KS Aviation/Sierra Academy bank statements over the course of the last several years, I found that tax payments were regularly made directly from the BBC▉▉▉ operational account and not by credit card. On 10/20/15, I referred the matter to the IRS Criminal Investigative Division for further investigation as to what individual or entity this tax payment was applied.

When I reviewed the second Chase credit account, ▉▉▉ I found that it was in the name of both "Dan Yoon" and "Sierra Academy of Aeronautics" and also had a mailing address corresponding to Sierra's main offices. The statements returned on this account were also for the period 01/14 – 07/15 and initially the account had a $15,000 limit. That limit was raised in 07/14 to $19,000 and then again in 02/15 to $23,000. The statements also indicated that additional cards were added to this account first in 03/14 when card ▉▉▉ was issued to Jong Ki Yoon (Daniel's son) and card ▉▉▉ to Brian Johnson (Sierra Academy's Chief Pilot). A third card was added in 06/15 when card ▉▉▉ was issued to David Marcum (Sierra Academy Simulator Technician). When I examined the various "categories" of spending associated with these credit cards I found, similarly to the Southwest card, Daniel used the card for various travel, retail, restaurant, convenience and grocery store purchases both in the Merced area, Bay Area and abroad. As previously noted in this report, Sierra Academy staff is unable to provide any sort of documentation pertaining to verified business trips taken by Daniel while acting as CEO/President, however, I did note that this card, like the Southwest card, was also used for travel expenses in China, Korea, Florida, Los Angeles and Las Vegas and amounted to over $30,000 in this 19 month period.

Blair stated that the trip to Miami in 08/14-09/14 involved Jong-Ki and Steve Aguilar who were sent to train with Boeing for the 737 simulator. Also in 09/14, Brian Johnson was sent to Orlando to pick up the Academy's King Air C90. Blair did not know the purpose of any trip Daniel made to Miami in 02/14, Washington DC in 04/15 or Johnson's trip to Reno in 08/14. Blair added that the Academy does not have a Southwest or Chase Business Ink issued in John's name as Daniel had canceled those cards at one point. However, she noted that when John did have these company cards issued to him he "never used them."

### HARRY KIM – INTERVIEW 10/21/15

On 10/21/15, I conducted an audio recorded interview with Hyun Soo "Harry" Kim, former Chief Financial Officer (CFO) for Sierra Academy. Kim stated that he is a Certified Public Accountant and was hired by Daniel Yoon in 01/14 to oversee all aspects of Sierra's finances. Kim stated that he had met Daniel in 2012 when he did some estate planning work for him and Daniel told Kim that when Sierra secured their EB-5 certificate he was interested in hiring Kim to work for Sierra on that project. In late 2013, Kim stated he received a phone call from Daniel who said he "had good news." Daniel told Kim that Sierra had been granted the EB-5 certificate and he asked Kim to begin work at Sierra in 2014. Kim told me that he understood Daniel to be the CEO and Chairman of the Board of Directors for Sierra Academy and believed that his hiring as CFO had already been approved by the Sierra board. He later learned that there had been no approval to hire him as an officer for Sierra as no board ever existed. Kim was fired by Daniel in 04/14. Kim stated that he was never given a full explanation of the reason he was being fired and was only told by Daniel that he "had damaged the company."

Kim described his duties as "supervisorial" over all accounting processes at Sierra Academy. He claimed that he recognized significant problems in several areas at Sierra almost immediately. Kim stated that one of the biggest problems he faced initially was that Sierra was using a "cash-based" system of revenue recognition when it should have been using an "accrual-based" system due to the nature of the business it conducted. The difference being recognition of revenue when it is earned and not just when payment is made. Kim stated that in his professional opinion, this had serious tax implications for Sierra as it appeared they were underreporting income for a substantial period of time. When Kim confronted Daniel with this and expressed his intention to change the method of reporting income, Daniel refused and told Kim he had to "reduce! reduce! [income]." Kim stated that he also found that Daniel regularly required employees of Sierra's "fuel farm" facility to work overtime but there was no evidence he ever paid them. Kim believed that and Daniel's insistence on classifying certain Sierra employees as "independent contractors" when they were really "w-9" employees by classification and duties were all attempts by Daniel to circumvent tax liabilities he would otherwise owe. Kim offered that he reported all of the matters concerning tax related issues at Sierra to the IRS Criminal Investigative Division in Oakland after he was fired.

During the course of my interview, I provided Kim with copies of the memorandum he wrote in 05/14 and gave to John Yoon detailing his knowledge of wrongdoing by Daniel while he was employed at Sierra as well as a letter John claimed that Kim wrote to Daniel in 05/14 asking that he be removed from Sierra's Board of Directors (*see 481992INI Atch. 1*). Kim reviewed both documents and confirmed he authored both documents and provided them to John. As he had documented in his memorandum, Kim reiterated to me that in addition to the problematic methods of accounting that related to tax issues, Daniel also engaged in questionable expense practices. For instance, Kim stated that early in his

Blair stated that the trip to Miami in 08/14-09/14 involved Jong-Ki and Steve Aguilar who were sent to train with Boeing for the 737 simulator. Also in 09/14, Brian Johnson was sent to Orlando to pick up the Academy's King Air C90. Blair did not know the purpose of any trip Daniel made to Miami in 02/14, Washington DC in 04/15 or Johnson's trip to Reno in 08/14. Blair added that the Academy does not have a Southwest or Chase Business Ink issued in John's name as Daniel had canceled those cards at one point. However, she noted that when John did have these company cards issued to him he "never used them."

### HARRY KIM – INTERVIEW 10/21/15

On 10/21/15, I conducted an audio recorded interview with Hyun Soo "Harry" Kim, former Chief Financial Officer (CFO) for Sierra Academy. Kim stated that he is a Certified Public Accountant and was hired by Daniel Yoon in 01/14 to oversee all aspects of Sierra's finances. Kim stated that he had met Daniel in 2012 when he did some estate planning work for him and Daniel told Kim that when Sierra secured their EB-5 certificate he was interested in hiring Kim to work for Sierra on that project. In late 2013, Kim stated he received a phone call from Daniel who said he "had good news." Daniel told Kim that Sierra had been granted the EB-5 certificate and he asked Kim to begin work at Sierra in 2014. Kim told me that he understood Daniel to be the CEO and Chairman of the Board of Directors for Sierra Academy and believed that his hiring as CFO had already been approved by the Sierra board. He later learned that there had been no approval to hire him as an officer for Sierra as no board ever existed. Kim was fired by Daniel in 04/14. Kim stated that he was never given a full explanation of the reason he was being fired and was only told by Daniel that he "had damaged the company."

Kim described his duties as "supervisorial" over all accounting processes at Sierra Academy. He claimed that he recognized significant problems in several areas at Sierra almost immediately. Kim stated that one of the biggest problems he faced initially was that Sierra was using a "cash-based" system of revenue recognition when it should have been using an "accrual-based" system due to the nature of the business it conducted. The difference being recognition of revenue when it is earned and not just when payment is made. Kim stated that in his professional opinion, this had serious tax implications for Sierra as it appeared they were underreporting income for a substantial period of time. When Kim confronted Daniel with this and expressed his intention to change the method of reporting income, Daniel refused and told Kim he had to "reduce! reduce! [income]." Kim stated that he also found that Daniel regularly required employees of Sierra's "fuel farm" facility to work overtime but there was no evidence he ever paid them. Kim believed that and Daniel's insistence on classifying certain Sierra employees as "independent contractors" when they were really "w-9" employees by classification and duties were all attempts by Daniel to circumvent tax liabilities he would otherwise owe. Kim offered that he reported all of the matters concerning tax related issues at Sierra to the IRS Criminal Investigative Division in Oakland after he was fired.

During the course of my interview, I provided Kim with copies of the memorandum he wrote in 05/14 and gave to John Yoon detailing his knowledge of wrongdoing by Daniel while he was employed at Sierra as well as a letter John claimed that Kim wrote to Daniel in 05/14 asking that he be removed from Sierra's Board of Directors (*see 481992INI Atch. 1*). Kim reviewed both documents and confirmed he authored both documents and provided them to John. As he had documented in his memorandum, Kim reiterated to me that in addition to the problematic methods of accounting that related to tax issues, Daniel also engaged in questionable expense practices. For instance, Kim stated that early in his

employment, Daniel came to him and asked him to write him a check from KS Aviation accounts for $10,000. When Kim questioned the purpose, Daniel told him that he had recently provided gifts to "Chinese customers" that he had paid for himself and he wanted to be reimbursed. Kim stated that Daniel offered no proof of the gifts in the form of any receipt or invoice and believed that his request should be honored just on his verbal notification to Kim. Kim refused to write the check and he recalled that Daniel became "very upset" and reminded Kim "this is my company." Kim stated that Daniel approached him "several more times" over the course of the four months he was CFO asking for reimbursement for things he had no receipts for. Kim stated he always refused to issue the requested checks to Daniel. Kim also recalled Daniel coming into his office sometime in 02/14 and asking him to prepare a wire application for approximately $20,000 to be sent to his sister in Korea "to repair his personal residence." Kim stated that he was previously aware that Daniel had a residence in Korea and had even been provided with a photo of the home by "Mr. Son," Sierra's employee in Korea. Again, Kim refused to prepare the wire believing that KS Aviation funds should not be used to fund Daniel's personal projects or expenses. I know from my review of the wire transfers from KS Aviation accounts in 2014, that on 02/05/14, a wire application in the amount of $20,453 was prepared and sent to Mr. Son in Korea referencing "housing repair cost." The application is signed by Daniel Yoon and was faxed to BBCN by Tillie Fontes who Kim stated was an accounting clerk that he supervised.

When I asked Kim about accounts held by Sierra Academy during his time there he stated that he was aware of both the operating and payroll accounts at BBCN, accounts as Bank of the West which he understood to be related to the Sierra Air Center Development, a Westamerica account and a Southwest and Chase Business Ink credit card. Kim described the Westamerica account as "very funny...like ugly." He stated that he had personally made cash deposits to this account for Daniel which he believed to be at times cash collected from the payment of student test fees as well as cash Daniel brought in from his restaurants. Kim had no proof that Daniel had obtained the cash from the restaurants but recalled that he would bring in approximately $5,000 at a time and ask for it to be deposited. Daniel never provided an explanation of where the money came from but he would then either personally withdraw money from the Westamerica account after deposit or ask Kim to withdraw the money. Daniel told Kim that the money to be withdrawn was for traveling purposes. Kim confirmed that Daniel traveled to China, Korea and Vietnam 1-2 times per month but as previously reported by Erica Blair, there were no records kept as to dates/purposes of these trips.

Kim stated that he had personal knowledge that Daniel had used company funds to pay expenses related to his Bay Area restaurants including "carpenters and architects." When I asked him how he knew those expenses were related to the restaurants, Kim replied that he personally knew Chris Cho who was Daniel's general contractor on the restaurant construction projects and when he saw invoices from Cho he called him and asked him for a copy of his W-9 to place on file at Sierra. Cho told Kim that he didn't work for Sierra he worked for Daniel at his restaurants. Kim could not recall if he specifically confronted Daniel about the use of KS Aviation funds for the payment of his restaurant expenses but did recall a more general conversation with Daniel where he advised him that the only expenses that should be paid out of company funds must be expenses related to the operation of Sierra Academy. Kim also provided examples of what he believed to be personal expenses paid by Daniel by the use of his BBCN debit card and/or Sierra issued credit cards. Kim recalled personally accompanying Daniel to Atwater Feed Store where he purchased dog food and "chicks" for raising. Although in the short time that he was there Kim was unable to fully get a handle on the "validity" of the expenses paid by Sierra monthly, he did notice charges to jewelry stores in Korea, travel agents and hotels in Daniel's hometown that

he believed were for personal use. Kim estimated he confronted Daniel about personal use of the BBCN debit and the credit cards at least three to four times in the four months he was employed and each time Daniel would ignore him. Kim confirmed there were no written policies in place governing the use of the issued cards and that was a task he had plans of undertaking when he was fired.

Kim stated that he did not prepare any board meeting minutes at Daniel's direction and was never made aware by Daniel that any board meetings were even held during his tenure at Sierra. Kim stated that he was instructed by Daniel to prepare a worksheet documenting distribution of KS Aviation stock. To prepare the worksheet, Daniel provided Kim with several promissory notes, which Kim verified were the same promissory notes I had been provided during this investigation. Daniel told Kim that the computation should reflect a "one for one" distribution of dollars contributed (as reflected in the promissory notes) to stock issued to Daniel. Kim stated he prepared the worksheet as he was instructed but had no knowledge of who had prepared the promissory notes or if they were legitimate. Kim was not aware of any deposits to any Sierra Academy accounts that were from loans that Daniel had made to the company and although he recalled Daniel telling him that he had sold his house in San Ramon and "moved to Dublin" Kim stated that there was never any deposit to Sierra accounts of proceeds from that sale. Further, Kim confirmed that the need for such loans as Daniel had asserted in his response to the civil lawsuit, was not accurate. Kim stated that Sierra was profitable with an average monthly revenue of "$1,200,000," a steady stream of income and timely payroll and expense payments. Kim never recalled Daniel expressing concern that Sierra was in financial trouble or discussing the need for any infusions of cash.

Kim never signed John's name to any document at Daniel's request nor did he personally witness Daniel signing John's name to any paperwork, however, Kim was aware that Daniel had applied for a small business loan to fund the 737 simulator project and later learned from John that the applications had been forged. Kim stated that even before learning of the forgery, he questioned Daniel's application for the loan as he knew from professional experience while sitting on previous boards that to encumber a company to any secured loan required board approval. Kim had previously stated that no board meetings were ever held and that he didn't believe a board actually existed until Daniel instructed him to draw up a new "SI-200" form for submission to the California Secretary of State. Kim later confirmed that the "SI-200" form he drew up was the Statement of Information for KS Aviation, Inc. filed on 02/24/14 (see *481992INI Atch. 1*). In that document, Kim indicated on Daniel's instruction, that he be listed as CEO, Secretary, Harry Kim as CFO and Directors as John Yoon, Brian Johnson and Robert Deklinski. When Kim viewed the "certification" page dated 07/16/14 which contained the signatures of Johnson and Deklinski that they alleged were forged, he claimed that page was not a part of the original document he prepared.

Kim stated that with the filing of the 02/14 Statement of Information he believed that KS Aviation had the only board that existed since its inception, although it did not appear to change operational matters much. Kim said that no board meetings were ever held, that he was made aware of and he knew of no official board action that was ever taken by these members listed which seemed likely given that Deklinski and Johnson both stated to me that they were never even aware they had been named to the board until 07/15. Further, after Kim was fired in 04/14 he sent a letter to Daniel advising him that he wished to officially be removed as a director from Sierra's board because he had never been informed by Daniel that his firing as CFO was directly related to his status o the board. Kim feared that if he was still a

named director at Sierra even after his termination, he could be liable for illegal actions Daniel may take on behalf of the board. It appeared that Kim was wise to do so as the SBA loan application that Daniel ultimately submitted (with John Yoon's forged signature) was dated 05/28/14 which resulted in the $5,000,000 loan granted to Sierra Academy for the 737 simulator project which was done with no board approval.

I asked Kim if he knew John Yoon and what, if any, John's role was at Sierra Academy while Kim was CFO. Kim stated that he knew of John, initially by reputation in the Korean community as an accomplished businessman with a long and distinguished family history in aviation. Kim knew John to be the founder of Sierra Academy and did recall seeing around the Academy campus in 02/14 but did not speak to him. This would have been around the time that John had actually returned to Sierra after his motorcycle accident. Kim stated he did not know at the time of John's accident and only later learned about his extensive rehabilitation. Kim also stated he was not aware of conflicts between John and Daniel until one day in 04/14 when John confronted him in his office with the common stock distribution worksheet Kim had prepared and demanding to know "what the hell are you doing?" Kim told John that he had no independent knowledge of the stock distribution and had prepared the worksheet based solely on information provided by Daniel. After he was terminated, Kim was contacted by John who provided him with additional information about what he believed were illegal actions taken by Daniel while John was away from the company and Kim agreed to provide information about what he witnessed while CFO. Kim stated to me more than once during the interview that he had respected Daniel and believed strongly in Academy as a source of quality training and as an employer to many here in Merced County. Kim also believed that the financial problems he encountered at Sierra could be fixed but found Daniel continually resistant to those changes to the point that Kim felt his integrity as a CPA would be compromised. Kim told me that like all other employees at Sierra, his job was in jeopardy each time he questioned Daniel's actions or pointed out any kind of wrongdoing. Kim described Daniel as a "dictator." That characterization made all the more humorous to Kim a conversation he recalled with Daniel in which Daniel told Kim he was afraid of him. Kim found such a statement incredible and asked Daniel why he would ever be afraid of him and Daniel replied, "You know about me too much." Kim told me that he believed at that time that Daniel was referring to how much Kim knew of his financial improprieties as CEO at Sierra Academy.

End of Report.