# Exhibit 8



## MERCED COUNTY DISTRICT ATTORNEY
## BUREAU OF INVESTIGATIONS

*CASE REPORT – SUPPLEMENTAL 05*

**DISTRICT ATTORNEY**
Larry D. Morse II

**CHIEF INVESTIGATOR**
Patrick N. Lunney

550 W. Main Street
Merced, CA 95340
Tel: (209) 385-7381

This e-copy is the official court record (GC68150).

## CASE INFORMATION

| | | | |
|---|---|---|---|
| **CASE NAME:** | Daniel Bong Yoon Sr | **DIV CASE NUMBER:** | 481992 |
| **CASE TYPE:** | Embezzlement | **RELATED CASE NUMBER:** | |
| **JUVENLE CASE:** | N/A | | |
| **ARREST DATE/TIME:** | | **REPORTING OFFICER:** | Anna Hazel DA43 |
| | | **REPORT DATE:** | 11/03/2015 |
| | | **APPROVED:** | *Wayne Hutton* Sup. Invest. Wayne Hutton – DAI2 |

## VIOLATIONS

| VIOLATION: | TYPE: | DATE AND TIME OCCURRED: | DATE AND TIME REPORTED: | LOCATION: |
|---|---|---|---|---|
| PC504 | F | 10/16/2014 TO | 10/23/2014 | |

## INVOLVED PARTY

| TYPE: | NAME: | RACE: | SEX: |
|---|---|---|---|
| Witness | Patricia Ann Brooks | W | F |
| **ADDITIONAL INFORMATION:** | | | |
| TYPE: | NAME: | RACE: | SEX: |
| Reporting Officer | Anna Hazel | | F |
| **ADDITIONAL INFORMATION:** | | | |

## SUSPECT(S)

☐ Unknown

| NAME: | DATE OF BIRTH: | AGE: | RACE: | SEX: | HEIGHT: | WEIGHT: | HAIR: | EYES: |
|---|---|---|---|---|---|---|---|---|
| Daniel Bong Yoon Sr | 08/19/1949 | 66 | A | M | 5'06 | 160 | BK | BR |
| **ADDRESS:** | | **PHONE:** | | | **DRIVER'S LICENSE:** | | | |
| 11933 Dublin Canyon Rd, Pleasanton CA 94588 | | | | | CA N94094453 | | | |
| **ALIASES:** | | | | | **ARRESTED:** | | | |
| Daniel Bong Boon Sr | | | | | | | | |

## NARRATIVE

**PAT BROOKS – INTERVIEW 10/29/15**

On 10/29/15, I conducted an audio taped interview with Pat Brooks, former Office Manager for Sierra Academy. Brooks stated she had been hired by Daniel Yoon in 03/11 and resigned in 04/13 after her working conditions became increasingly difficult. Brooks stated that while she was hired by Daniel as the Academy's Office manager she was tasked with numerous additional duties including payroll, accounts payable, accounts receivable, overseeing dispatch, maintenance, kitchen and student services. Brooks stated there was no other additional office staff employed by Sierra and that she answered directly to Daniel. Brooks understood Daniel to be the "owner" of Sierra Academy at that time

Case: 20-04021    Doc# 286-9    Filed: 06/24/24    Entered: 06/24/24 20:34:53    Page 2 of 4

and was aware that John Yoon had been the founder of the Academy. She mentioned that she saw John around the campus engaged in various duties involving maintenance or dispatch but that she didn't see much of a "partnership" in the business between Daniel and John. Brooks stated that Daniel basically directed John to various tasks and "...just kind of ran over John."

Brooks confirmed that it was Daniel that was in charge of all aspects of the finances at the Academy and that he directed all payments to vendors and signed all checks issued. Brooks recalled that she had "no option in that." Brooks claimed that the only time she could recall John being allowed any involvement in finances was if Daniel was out of the country and a check needed to be signed. However, Brooks stated that Daniel made great efforts to keep John from even that small task and would often "pre-sign" checks before leaving on a trip and store them in his office safe which Brooks was allowed access to.

Brooks had described her accounting duties as including the monthly reconciliation of Sierra's BBCN operating account (which also was used for payroll at that time and has since been divided into two separate BBCN accounts). When I asked her if she recalled seeing "questionable" expenses being paid out of this or any other account she replied that she did recall paying bills for Hana Japan which she knew to be one of two restaurants Daniel's owned in the Bay Area. Brooks recalled that Daniel would bring invoices to her, related to the restaurants, for payment. She could specifically recall paying food vendors that supplied the restaurants from Sierra's accounts at Daniel's direction. When I asked Brooks if she recalled paying any contractors she stated that she did but that the Academy was undergoing renovations at that time and she believed those to be legitimate business expenses. I asked if she recalled any Bay Area contractors working on the Academy's projects and she stated "no" and that Daniel had hired a local contractor for that work. While she couldn't recall Daniel mentioning any renovations he may have commissioned at either of his restaurants during this same time, she did recall Daniel telling her that he was planning to build a third restaurant in Pleasanton, CA. Brooks stated that she actually worked with the Oakland-based banker that was going to extend a $2,700,000 small business loan to Daniel for that project. Brooks completed loan paperwork for Daniel and provided it to him for his signature, however, she was unaware if the loan went through or if Daniel had actually ever built another restaurant. She did recall that fees to the City of Pleasanton were paid from Sierra's funds related to Daniel's pursuit of that new build.

Brooks described Daniel's extensive travel as frequent (often at least one trip per month) but with "no set pattern." Brooks did not have any evidence that Daniel was ever traveling for personal reasons and did not know that Daniel had a residence in Korea.

In addition to the main operating account at BBCN, Brooks was aware of the Westamerica Bank account in the Academy's name. She stated that she was unsure of the exact source of income to that account but recalled it mainly being used for the payment of overtime to some employees and to withdraw cash for Daniel's travel or out of town guests. Brooks did not recall making any cash deposits to this account or any other Sierra account. However, she did recall Daniel telling her periodically that he had made a deposit to Sierra's BBCN operating account "to cover expenses" that he wanted paid immediately. Brooks could not estimate how many times Daniel may have told her that but she did believe she saw those deposits later when reconciling the bank statements and that they were categorized for Quickbooks purposes as "loans." Brooks claimed that those deposits were not frequent or "large" sums of money and

This e-copy is the official court record (GC68150).

were maybe "$25,000 to $50,000" each. Brooks stated that Daniel never told her if these deposits were from his personal funds or "loans" from his restaurant businesses but she did not recall ever issuing checks payable directly to Daniel or his restaurants in repayment for any "loan." Rather, Brooks stated that she saw some sort of "loan document with the payment of interest" that Daniel had drawn up and agreed that it could have been a promissory note. Brooks didn't know the purpose of that note or how it may have been used but described only being "aware" of it.

I asked Brooks if Daniel had told her that he was selling his San Ramon residence in 2012 and she stated that he had mentioned that to her. Brooks stated that Daniel had told her that there were relatives of his living in the home and that they had "trashed it" causing him to evict the relatives and make extensive renovations "to put it on the market." Brooks stated that at no time did Daniel ever describe the sale of that residence as a necessity to infuse money into Sierra Academy because of financial troubles the business was having nor did she ever recall seeing any deposits in excess of $700,000 to Sierra's accounts after the sale of the house (that were not regular income to the business).

Brooks stated that at the time she was employed at Sierra Daniel did not take a salary and that Sierra Academy was not paying for any housing expenses. Brooks offered that "it would have been cheaper to pay him [Daniel] a salary." When I asked her to elaborate, Brooks claimed that "any and all living expenses" of Daniel were paid by use of a Sierra Academy issued credit card. Brooks stated that Daniel used that card for car repairs, gas, restaurants etc. and that those expenses were never categorized for Quickbooks because the credit statements were not reconciled. These expenses were mingled with regular, monthly business expenses charged to the card but all expenses, personal or business, were paid in one monthly payment out of Sierra's account.

Brooks stated that when she was hired at Sierra Academy there was no one acting as the office manager and she was unaware of the names of anyone who may have done it before her. I had initially believed that Brooks had begun employment with Sierra much sooner and had likely been the person responsible for the handwritten notes on the BBCN statements I reviewed from 2009-2010 which appeared to indicate deposits made to the operating account by Daniel. There are no such notes appearing on the statements in 2011-2013 and it is still unknown who may have written those notes on the previous statements.

Brooks described the working environment at Sierra Academy as very difficult for her and that when she left in 2013 she literally walked out of the office after being forced to (unjustly) fire an employee at Daniel's direction, and never returned. Brooks became emotional during the interview recalling that incident and stated that it still bothers her almost three years later. Brooks agreed with previous statements by employees of Sierra that Daniel was a "tyrant" and a "dictator." She claimed that he often engaged in unfair business practices (i.e. forcing overtime that he did not pay or firing employees without justification) that she constantly reminded him of the illegality of. According to Brooks, Daniel believed his way of doing things was the only way and he had little regard for much else. Brooks claimed that in her opinion, "bringing Dan in was John's biggest mistake."

End of Report.

Case: 20-04021    Doc# 286-9    Filed: 06/24/24    Entered: 06/24/24 20:34:53    Page 4 of 4