# Exhibit 10



# MERCED COUNTY DISTRICT ATTORNEY
## BUREAU OF INVESTIGATIONS

**DISTRICT ATTORNEY**
Larry D. Morse II

**CHIEF INVESTIGATOR**
Patrick N. Lunney

550 W. Main Street
Merced, CA 95340
Tel: (209) 385-7381

### CASE REPORT – SUPPLEMENTAL 01

## CASE INFORMATION

| | |
|---|---|
| **CASE NAME:** Daniel Bong Yoon Sr | **INV CASE NUMBER:** 481992 |
| **CASE TYPE:** Real Estate Fraud/Embezzlement | **RELATED CASE NUMBER:** |
| **JUVENILE CASE:** | |
| **ARREST DATE/TIME:** | **REPORTING OFFICER:** Anna Hazel DA43 |
| **STATUS:** | **REPORT DATE:** 06/30/2015 |
| | **APPROVED:** *Wayne Hutton* Sup. Invst. Wayne Hutton – DAI2 |

## VIOLATIONS

| VIOLATION: | TYPE: | DATE AND TIME OCCURRED: | DATE AND TIME REPORTED: | LOCATION: |
|---|---|---|---|---|
| PC504 | F | 10/16/2014 TO | 10/23/2014 | |

## INVOLVED PARTY

| TYPE: | NAME: | RACE: | SEX: |
|---|---|---|---|
| Witness | Blair  Erica | W | F |

**ADDITIONAL INFORMATION:**

| TYPE: | NAME: | RACE: | SEX: |
|---|---|---|---|
| Reporting Officer | Anna  Hazel | | F |

**ADDITIONAL INFORMATION:**

## SUSPECT(S)

☐ Unknown

| NAME: | DATE OF BIRTH: | AGE: | RACE: | SEX: | HEIGHT: | WEIGHT: | HAIR: | EYES: |
|---|---|---|---|---|---|---|---|---|
| Daniel Bong Yoon Sr | 08/19/1949 | 65 | A | M | 5'06 | 160 | BK | BR |

**ADDRESS:** 11933 Dublin Canyon Rd, Pleasanton CA 94588
**PHONE:**
**DRIVER'S LICENSE:** CA N94094453
**ALIASES:** Daniel Bong Boon Sr
**ARRESTED:**
**SSN:**
**STATE ID:**
**CLOTHING, DESCRIPTION, TATTOOS, OTHER I.D.:**

## NARRATIVE

### BACKGROUND

On 10/16/14, I met with John Yoon, CEO of KS Aviation and his attorney, Vincent Kim. Yoon explained that he had hired Kim in anticipation of a civil suit he was seeking against his partner in KS Aviation, Daniel Yoon (no relation). During the course of discussions between Kim and John Yoon regarding the business and its operation and Kim's review of

documents pertaining to John's complaint against Daniel Yoon, Kim believed that the allegations may be criminal in nature and he advised John to contact the Merced County District Attorney's Office.

### ERICA BLAIR – INTERVIEW 06/04/15

On 06/04/15, I conducted an audio taped interview with Erica Blair, Office Manager for Sierra Academy of Aeronautics. Blair stated that she has worked for Sierra Academy as their office manager since 04/14 and was currently tasked with all payroll duties as well accounts payable/receivable and acts as executive assistant to the "owner," Daniel Yoon. Her "executive assistant" duties include making travel arrangements, keeping appointment calendars, etc. Blair stated that her duties in that capacity are limited to only travel and appointments Daniel wishes for her to know about or be involved in. When I asked her to explain that statement she stated that if Daniel and other Academy employees were taking a legitimate business trip she was usually tasked with making the arrangements. However, if Daniel was taking a trip alone, with no declared business purpose, he often made the arrangements himself. This has led Blair to believe that although paid for by Sierra Academy, not all trips taken by Daniel have had a legitimate business purpose and he chooses not to let her know the details of those particular personal trips.

Blair stated that the Daniel's practice of scheduling his personal trips were "fine" with her. She explained that she had learned there are many things about Daniel's business activities that she would rather not have involvement in. She stated that Daniel is largely intolerant of employees that would not simply do as he says. This has caused an enormous amount of turnover within the office and resulted in several lawsuits. Blair explained that Daniel was verbally abusive to her and to other employees, often threatening them with job loss or has fire some employees without "cause" when they did not immediately comply with what he wanted. Although Blair had been with Sierra Academy just over a year, she stated she was the second most senior employee there.

Blair said that financial problems had been the root cause of many of the firings within the front office and that Daniel had fired 3 separate "in-house" CPA's (certified public accountants) Harry Kim, David Hun and Moon Kim in just the last year. Blair believed Daniel fired these individuals when he learned they had tried to reconcile the academy's accounts to get an accurate picture of the business finances. Blair believed Daniel was more interested in a CPA that would simply do as he said and only produce what he authorized. She explained that Daniel had long used an outside CPA, Kwangwuk Kwon, Hwang & Choi CPA's in Oakland, when he has needed financial statements to support a business matter. Blair stated that Sierra Academy currently paid this firm $1,500 bi-weekly, but she did not believe that they had any access to the Academy's financial data (i.e. QuickBooks). Blair had no idea what information they used to compile any financial reports for Daniel's use. She said that whatever they were using as source material it couldn't be accurate. She believed that prior to being fired a few months ago; Moon Kim had successfully reconciled the QuickBooks figures for 2014. Blair stated that she could not say whether, or not, the QuickBooks account(s) information prior to 2014 was accurate, because to so many people had been responsible for the entries into the system. She stated that she believed the QuickBooks files for 2014 would be the best representation of the Academy's finances that probably existed.

I asked Blair to explain to me the process for entry of information into the Academy's QuickBooks files since she became office manager. She stated that she was responsible for all receivables, payables and review of bank, loan and credit statements that came into the Academy each month. She stated that after she has reviewed all of that information and appropriately "coded" the expenditures (matched them to the appropriate account and income/expense line item), she

passed the information to her Accounting Assistant, Norma Garay, who then entered the information into QuickBooks. Blair stated that she also completed payroll through QuickBooks after collecting all timecards, hand calculating the hours and verifying rates of pay. She then entered that information into QuickBooks, printing the payroll checks and she then dispersed them to employees.

Blair confirmed the existence of two BBCN banking accounts for Sierra Academy and characterized one as an "operating" account ▇▇▇ and the other as a "payroll" account ▇▇▇. She stated that she paid payroll out of the payroll account and other regular expenses from the operating account. She explained that the payroll account was funded through transfers from the operating account. Blair added that she had online access to Sierra Academy's BBCN accounts, but only accessed the account online as directed by Daniel to perform the transactions he requested. She stated that in the last year she had initiated transfers of money out of the operating account into the payroll account approximately three times; all at the direction of Daniel who was out of the country at the time and unable to do it himself. The purpose of the transfers was to cover the payroll for that time period.

Blair stated that she regularly assisted in the procedures (i.e. completing the bank forms) for wire transferring funds out of the BBCN primary account, but she did not have the authorization to complete the wire transfers. She stated that when a wire transfer was to be done, Daniel would instruct her on the amount, the payee and, at times, would advise of the purpose. Blair then completed the bank wire transfer document and fax it to BBCN. The bank would then call Daniel directly for verbal authorization and the wire transfer was then completed. Blair stated that over the course of the last year, she had questioned the legitimacy of some of the wire transfers she had been asked to initiate. She recalled that Daniel had told her to contact his wife for the details of one wire transfer that she was directed to initiate. Blair said that was when she realized that some of the wire transfers were likely not to have been business related.

She particularly described completing paperwork to wire transfer large sums of money from the Academy's BBCN account to Daniel's sister, Yoon Bong Soon, in Korea. Blair said that she believed that the money was being used to purchase or renovate a home that Daniel Yoon owned in Korea. She explained that Daniel never directly told her that was the purpose of the wire transfer of funds, however, Daniel's son, Jong Ki Yoon, an employee of Sierra Academy, had traveled to Korea soon after the wire transfer were made. On his return to California, he had spoken to her about the home his family owned in Korea, and showed her photos of the renovations that were being done. Blair stated that she maintained copies of all of the wire transfer documents she has completed since she began working for Sierra Academy. She agreed to provide those copies to the District Attorney's Office.

When I asked Blair about Jong Ki's employment status at Sierra Academy she stated that he had no job title or regular duties at the Academy that she was aware of; Jonk-Ki basically "does whatever Dan tells him to do." She explained that "I pay him" like a regular employee. She believed he had been an employee (on the payroll) for at least a year.

I asked Blair if she could confirm a list of accounts I had identified in my investigation as belonging to (or had once belonged to) Sierra Academy and/or its employees. After reviewing the list, she said that in addition to the BBCN accounts, Sierra Academy also had checking accounts at Bank of the West, Westamerica Bank and Summit Bank. When I asked her to describe what these accounts were used for, she stated that there were actually two Bank of the West accounts ▇▇▇ and ▇▇▇ which were opened to act as the operating and payroll accounts for the Sierra Air

Development Center. Blair explained that Daniel was trying very hard to find investors to the company's EB-5 (a special immigrant investor visa) program so that the development portion of the business could get up and running, however, she stated that to date, she knew of only one source of potential income to the Air Development Center, Boeing, who has agreed to pay Sierra for trainee flight time in their 737 simulator.

Blair was careful to note this was an *anticipated* source of income to these accounts and that such training and payments had not yet begun and that all money that already appeared in these accounts are a result of transfers to them from Sierra Academy accounts. Further, Blair stated that all Sierra Air Development Center expenses (i.e. simulator project, renovation to simulator building, renovations to dormitories) has been paid out of Sierra Academy monies as the Air Center has generated no revenue for these projects. I expressed some confusion at this because I understood the EB-5 program to be designed for foreign investment to develop the land in and around the airport complex but Blair simply stated that the simulator "is the EB-5 program" and no investors for development of the airport have been found.

Blair also said that Sierra Air Development Center had two lines of credit with Bank of the West totaling $1,000,000 that she was aware of. She stated that a line of $400,000 used to purchase the 737 simulator, with repayment being made of $16,000 per month. She further stated that the $600,000 line was available and had not been used until just recently. She explained that a few months ago she transferred the entire line of credit to the business operating account to cover expenses. When additional income was received later in that same month, she repaid the full balance of the credit line. She stated that there have been several times when Sierra Academy expenses had soared with little or inconsistent income and such actions were necessary. On those occasions, Daniel would instruct her to immediately begin calling their airline customers to "persuade" them to remit any outstanding monies owed to the school so that they could continue to operate.

According to Blair, the Westamerica account served only as a local "convenience" account Daniel's use. She did not have any idea what he may used the money in that account for, as it was not included in the Academy's QuickBooks accounting software. She stated that Daniel had previously instructed her to deposit all incoming checks payable to Sierra Academy (described as miscellaneous deposits) to the Westamerica account. She explained that the primary checking account at BBCN was located in Oakland, CA, and primarily received student related deposits (tuition, etc.). Blair stated that she did not have regular access to the Westamerica account. She believed that the only signer on the account was Daniel Yoon. She said that statements for that account were not sent to the Sierra Academy office like the other accounts. She could not be certain of the balance of funds in the account, but added that in the past few days Daniel had instructed her to write him a check out of the BBCN account, payable to "cash", for $2,000. He also directed Norma Garay to write him another check, payable to "cash", for $3,000. Blair stated that the Westamerica account was the only local account "the company" had. She believed that Daniel likely cashed both checks at Westamerica Bank. Blair said that she had confronted Daniel about the "cash" payments and asked for an explanation of the expenses so that she could properly note it in QuickBooks. She stated that Daniel told her he "didn't know yet" how he was going to use the money and directed Blair to "put it to travel." Blair confirmed these types of payments occurred "often;" adding that Daniel was largely unwilling to provide her with information to accurately document the expenses.

Blair described the Summit Bank account as an "old account" that was not used by Sierra Academy at all. In fact, she said that she had recently received notification that the account was going to be closed for inactivity. Blair passed the notice

on to Daniel who signed the documents to request that the account to be left open. She stated the account had approximately $25,000 in it.

Blair also confirmed that Sierra Academy had accounts with Bank Direct Capital Finance, Hong Kong and Shanghai Banking Corporation (AKA; HSBC) MasterCard account (no longer in use), Chase Business Credit and Southwest Airlines Rewards. Blair believed that the Bank Direct Capital Finance was a line of credit account serviced by Wells Fargo (possible airplane loan) but stated would need to verify that. She was confident that the Chase Business Credit account was in use and that currently, Daniel, Jong Ki, Brian Johnson (Vice President of Sierra Academy) and a new simulator technician, Dave Markham, have all been issued cards on that account.

Blair stated she received the monthly statements for that account and reviewed each one for purposes of "coding" the transactions (matching the expense to the proper QuickBooks line item). She said that use of this account by the employees who were issued cards to be approximately 50% business use and 50% personal use. She stated that there were no controls placed on the use of these cards (other than the credit limit for each card) because Daniel basically approved all spending to these cards whether they were legitimate business expenses or not. Blair stated that, for example, she has reviewed the statements and found retail spending at various outlet stores by Jong Ki. She had personally gone to Daniel and pointed out that these charges were not business expenses, explaining that she could not code them properly as such in QuickBooks. She stated that Daniel had instructed her to treat the charges as "gifts" or "uniforms" for purposes of coding and to log them as business expenses when they clearly were not. Blair said that accounting misrepresentations like that was why she had earlier cautioned me that many of the QuickBooks files were grossly inaccurate in terms of actual legitimate business expenses for the company.

I asked Blair if there exists any reimbursement process for personal expenses charged to Sierra Academy and she stated that there is but it is rarely used. She stated that there is an "expense report form" that is kept in the office that an employee can fill out and attach a receipt to for processing of a reimbursement. However, she stated that most of the time Daniel just "gives" money to employees anyway and no reimbursement or structured repayment is even addressed. For instance, Blair stated that Daniel recently provided an employee with $3,000 out of Sierra Academy funds to assist him in purchasing a home. She stated that Daniel told her that the employee would reimburse Sierra by "working extra hours" to pay the money back; however, she stated the money was given a month ago and that there has been no change in the employee's timecard.

Blair said that the Southwest Airlines credit account was primarily used for travel and confirmed that both John Yoon and Daniel Yoon both had cards issued on this account. Blair stated that John rarely, if ever, used the account and that was reflected in the statements she regularly received and reviewed. She claimed that Daniel did use the card regularly to purchase airline tickets for employees attending meetings or for student flights back to their home countries which she considered to be legitimate business expenses. However, like the Chase account, Blair believed that the Southwest credit line was also being used for non-business purposes. She offered that recently, Brian Johnson traveled to Vietnam for a one day business meeting at a flight school. She said this was an appropriate travel charge, however he also took his wife and they stayed in the country for a week. All travel and accommodation expenses, for both Brian and his wife were paid by Sierra Academy. She also stated that the Southwest card had been used to purchase airline tickets for Jong

Ki to travel to China to complete his master's degree and also for other members of Daniel Yoon's family to travel abroad.

Given that Blair had access to and was involved daily with the accounts held by Sierra Academy, I asked if she was aware of any "loans" or deposits to Sierra Academy's accounts from Daniel or any one of his other businesses (Blair indicated during this interview that she is aware that Daniel owns two restaurants in the Bay Area). Blair stated she knew of no loans that Daniel has made to the business or any infusions of cash from any of Daniel's businesses. However, Blair did say that she had been instructed by Daniel, at times, to issue checks from Sierra Academy's BBCN account to vendors for expenses that she was not previously aware of. When she asked Daniel what the expenses pertained to he told her the bills related to his "restaurants."

She said that Daniel had direct access to Sierra Academy checks, and she knew that he had written checks to pay for expenses pertaining to his restaurants directly. She explained she would find out about these payments after the fact, when the bank statements came in. She stated that when that happened, she would use her online access to the BBCN account to pull up an image of the questioned check. She said she would find that Daniel Yoon had written the check from the Academy's business account(s) to pay vendor for expenses relating to his personally businesses. I asked Blair if she had confronted Daniel about such expenditures and the fact that he had not informed her of the checks he had issued personally. She stated that she had. He acknowledged writing the checks, but then added something like, "Oh yeah, I have to take care of that."

Blair also described problems with the accounting of the petty cash fund that was kept in a safe in Daniel's Academy office. Blair confirmed that she began keeping a separate log of the deposits/withdrawals made to the petty cash fund earlier this year because of the constant irregularities. Blair stated that the student fees for flight tests were always received in cash and given to the test proctor "Gabby." Gabby would often wait a few for cash to accumulate and then will draft a "receipt" for the several hundred dollars she took in. She would then wrap the cash in a sheet of paper and provide it to Blair to handle.

Blair stated that she became uneasy handling the cash from the test fees given what she has witnessed in terms of Daniel's misuse of company funds. She explained that she did not want to give Daniel an excuse to blame her for any Academy funds that were missing. She stated that she began keeping a spreadsheet noting the date, student name and amount of each cash package she received from Gabby. She would also note what she did with the money; "handed to Dan," "placed in the safe" or "put on Dan's desk." She emphasized that a log (separate from her spreadsheet) of the deposits/withdrawals for the petty cash was kept inside the safe with the money. She added that she knew that Daniel did not keep accurate records on this log. The amount in the safe was always less than what was reflected on his log.

Blair said she had confronted Daniel about the discrepancies, telling him that it was very important for him to keep accurate records of any withdrawals he makes and noting the purpose for it. She stated that Daniel was not receptive to her warnings at all and often told her that he just "doesn't remember" withdrawing money or "forgot" to log a withdrawal. Blair stated that she did not know what Daniel used this cash for. She estimated that thousands of dollars was missing from the safe at any given time.

I asked Blair if anyone else had access to the safe. She explained that the safe was both a combination and keyed safe. She stated that the key to the safe was kept in Daniel's office and that only she, Daniel and Jong Ki had a key to Daniel's office, however, only Daniel had the combination to the safe. When I asked about her notations on her personal log that she deposited money to the safe, she explained that when that occurred, she would tell Daniel that she had petty cash to place in the safe and he would personally enter the combination, leaving the dial on the last number, then allow her to use the key to open the safe and place the money inside. Blair was adamant that she did not have full access to the safe, which required both the combination and the key and did not believe that anyone other than Daniel had both the combination and key to the safe.

### ERICA BLAIR – INTERVIEW 06/10/15

On 06/10/15, I conducted a second, audio taped interview with Erica Blair at the Merced County District Attorney's Office. During this interview, Blair provided me with two large ringed binders containing Nara Bank (now BBCN Bank) statements for Sierra Academy for the period 09/09 – 12/09 and all of 2010-2011. The binders also contained Nara Bank statements for 2011 for Sierra Air Center and Westamerica Bank statements for KS Aviation for 2011. Analysis of the information in these binders will be documented in a separate report.

Blair confirmed that her position as Office Manager at Sierra Academy reports directly to President/CEO Daniel Yoon. Blair stated that she knew John Yoon and had been told by Jong-Ki that prior to an accident that John had been in before she was hired; John had helped run the flight school and was the founder of the school's parent company KS Aviation. Blair said that since she began her employment with the school, John was present daily in the maintenance department of the school but basically just "hangs out." She stated that he had no authority at the school, nor did he provide any direction to staff members. Blair was never told why John was relegated to such a position in a company that he founded or how it came to be that Daniel was running the company exclusively. She said it was very clear that John had "no role" in the company while she been there. Blair believed that Daniel, Brian Johnson and Bob Deklinski (CEO of Sierra Air Development Center) were the "owners", because of stock ownership in the academy. She said she based this having seen documents she believed were Articles of Incorporation, or similar documents, that would be filed with the state. Blair was unaware of any present Board of Directors for the company. She was unaware of any board meetings, had never been tasked with preparing meeting minutes or agendas in the year and half she had worked at the Academy.

In our previous interview on 06/04/15, Blair discussed the fact that she would review company bank statements and occasionally find expenditures she did not recognize. Many times these would be checks written by Daniel on company accounts or debits she was unfamiliar with. Blair stated she would address these expenditures with Daniel and categorize them (associate them with the proper accounting expense line item) based on his instruction. I asked Blair if there were time when anyone else was ever responsible for such "unfamiliar" expenditures and she stated there was not. She confirmed that the company checks were kept unlocked in her desk drawer but the only checks she had observed written on the Academy accounts have been by her or Daniel. She further confirmed that only Daniel had a debit card associated with the Academy's primary checking account at BBCN and all debit expenditures on that account belong to him.

Blair reiterated that that Daniel's expenditures on the academy BBCN account were quite often unrelated to Academy business. She said Daniel's use of the BBCN debit card was for "everyday spending", describing it much like the way

someone would use their own personal bank account. She said he used the card daily for his grocery purchases, retail spending and meals. I provided Blair with copies of the summaries John had previously provided to me which outlined what he believed to be examples of Daniel's abuse of company funds *(ref: Atch. 1)*. Blair confirmed that many of the expenditures outlined in these summaries were in fact Daniel's and that they were for non-business related items. She specifically mentioned Daniel's purchase of a jade bedroom set (Ye-Won House of Jade) in 2014 which was paid for by Sierra Academy. The bedroom set cost $4,100 and when Blair confronted Daniel about the purchase he told her that the purchase was for furniture that would be placed in the dormitories at the Academy. Blair found the explanation ridiculous given that the bedroom set included a king sized bed made with jade. She later found out that it had been delivered to Daniel's residence in Pleasanton. The expenditure was categorized under "student housing" at Daniel's instruction. Blair also commented on the on $15,000 check (#29563) written to Brian Johnson on 04/22/14. The check was categorized under "gifts" and Blair stated that Daniel wrote that check. She was not provided any details about the "gift" but had heard from other staff members that the money was given to Johnson to purchase a boat. Blair stated that she "sees that stuff all the time." She said that many of the debits or checks payment that Daniel directed to be categorized as "gifts" were simply retail purchases he had personally made. Blair claimed that she had never seen Daniel provide any client, employee or student with any physical gifts.

Blair also confirmed that the Academy paid Johnson's housing expenses (i.e. rent) monthly and had done so since she was hired. She was not aware of any employment contract with Johnson that included such expenses; however, she offered that the company also pays John's monthly housing costs. Blair was not aware of any other employees who received that benefit.

I asked Blair to review a copy of a Sierra Academy check (#30907) issued to Daniel Yoon's restaurant Hana Japan on 10/14/14 *(ref: Atch. 2)*. The check was for $60,000. Blair looked at the check. She confirmed it was a check written by Daniel. She said that it was an example of what she had previously mentioned to me. She said that this was check that had been written by Daniel which she was completely unaware of until the bank statement for that month was received. She said that when she saw the check entry on the bank statement she confronted Daniel about the expense. She said that he refused to provide her with an explanation. Blair stated that she was "90% sure" the money was used to pay taxes for the restaurant. Blair did not have proof that the money was used for tax purposes but based her assumption on a previous situation in which a large check was written on Sierra Academy accounts to Hana Japan. At that time, Daniel told her that the money was needed to pay taxes for the restaurant. I reminded Blair that in her first interview she noted that Daniel told her that he "had to take care of that" when discussing with her using Sierra Academy funds for payment of personal or Hana Japan expenses. She clarified that when she made that statement in the first interview she understood Daniel to be referring to the fact that there were expenses at his other businesses that he was responsible for and he "had to take care" of them using what funds he had available, even Sierra Academy funds.

Blair stated that accounting firm of Hwang & Choi handled all tax related matters for Sierra Academy and may be involved in the issuing of 1099's for contract employees of the Academy. Blair stated that she knew of only 4 or 5 contract employees that are issued 1099's at Sierra Academy. These were mainly "DPE Examiners" who are contracted for examinations through the FAA. When I asked Blair if she had ever been asked to issue 1099's for anyone who she did not recognize as a contract employee for Sierra Academy she stated that she had not. She did mention, however, that after starting work at Sierra Academy she had received a list of 1099 employees from the previous year (2013). There

were names on that list that she didn't recognize as any DPE Examiners that she was familiar with but she could not confirm who they were or where they may have worked in 2013. (Note: John Yoon had previously alleged that Daniel was issuing 1099's to his restaurant employees as contractors for Sierra Academy to avoid payroll taxes.)

I provided Blair with a copy of the "Sierra General Ledger" (received from former Sierra Academy CPA Jeffrey Lee) taken from Sierra Academy's QuickBooks records for the period 2007-2014 and noted the highlighted portions of those records that read "Loan from Hana Japan" *(ref: Atch. 3)*. The accounting that appeared on these ledgers was not completely clear as to each expense purpose and appeared to show both deposits to Sierra Academy's accounts (presumably from Hana Japan). The ledger also showed debit and checks written for various expenses, including to the IRS, Hohback-Lewin Inc, CND Construction, Debolt Civil Engineers, William Wood Architects, City of Pleasanton, Bank of the West and back to Hana Japan. It should be noted here that all of these construction companies, architects and engineering firms are located in and around the Bay Area and according to John, were used for renovations and new construction for Hana Japan restaurants. According to Lee, the ledgers showed that (unconfirmed) "loans" made by Hana Japan to Sierra Academy that were used to pay expenses related to Daniel's restaurants and/or distributed to him personally. However, the "loans" totaled $219,800 and were showed to have been made in the years 2007 and 2009. After 2009, there were no new deposits, however debits to this "loan" continued and by the end of 2014 the debits exceeded those "deposited" by more than $300,000. According to Lee, by 12/14, Hana Japan actually owed Sierra Academy $397,676 *(ref: Atch. 4)*.

I again asked Blair if she was aware of any "loans" that Daniel's other businesses had made to Sierra Academy (although they pre-dated her employment there). She stated she was not aware of any money loaned to the Academy by Daniel, his other businesses or anyone other party. Blair did state that she had seen the daily planner that Daniel kept and knew that he used the planner to note deposits to Sierra's accounts as well as debits. She believed that he got this information by accessing the BBCN Bank statements available online. Blair said that Daniel did not provide any information from his planner to her for reconciling purposes and she believed it is simply Daniel's way of personally keeping track of Academy funds. She has not personally reviewed all the data in the planner and could not account for its accuracy.

I told Blair that some pages from this journal were provided to me and that the information contained in it indicated that Daniel had made personal deposits or "loans" to the Academy at various times *(ref: Atch. 5)*. Blair reiterated she was unaware of any deposits, other than regular income from airlines and students they served, made to any of Sierra's accounts. She further offered that BBCN Bank is located in Oakland, CA and there are no local branches that will accept deposits on Nara Bank's behalf. Blair has not known Daniel to ever make trips to Oakland, CA for the purpose of depositing money to Sierra's accounts, nor known him to mail any such deposits and offered again that if a deposit to Sierra's accounts had been made from a source she was unfamiliar with, she would have noticed it in her monthly review of the bank statements.

I asked Blair to tell me what she knew about the pending sale of the Academy simulator building and surrounding acreage to Daniel. Blair said that Daniel had told her that he was personally purchasing the property and had instructed her to go to the Merced County Tax Collector's Offices to clear outstanding liens on the property. Blair believed that she has paid approximately $23,000 in outstanding liens on the property to date and provided the receipts to Daniel to pass on to his escrow company. Daniel had not shared with her any plans he may have for the property. However, she was

told by Brian Johnson that Daniel planned to purchase the property and lease it back to the Academy "at a higher amount." Blair stated that over the course of the last 18 months she had issued payments from Academy funds "in the millions of dollars" for renovations to the property and construction of the simulator building. I provided Blair with a copy of a QuickBooks report from Sierra Air Development that listed expenses for the renovation and pointed out that that totals appeared to be around $2,000,000 *(ref: Atch. 6)*. (Note: Although these were categorized under Sierra Air Development, Blair had already explained that this entity has had no income at all since its inception and all money "spent" by the Air Development center is provided by Sierra Academy.) Blair stated, "I think it is more." She pointed out that within the last few days, she had issued a $29,000 payment to address a problem with the sprinkler system in the simulator building and that work invoice continued come in. She also pointed out that many of the expenses in the QuickBooks report are "coded" with line item "1250." She explained that line item "1240" had also been used (prior to her hiring) for renovation expenses attributed to the simulator building/project. She stated that she believed the accounting for expenses using the line item "1240" and "1250" would show that the renovations have exceeded $2,000,000. From Blair's description of events, it appeared that Daniel Yoon had entered into a personal purchase contract with the County of Merced to buy the flight simulator building (and the surrounding acreage) for $750,000, after he had directed several million dollars of Sierra Academy funds be spent to purchase the jet simulator and renovate the building/surrounding property.

This investigation remains ongoing.

End of Report.