

The following constitutes the order of the Court.
Signed: January 8, 2025

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>DANIEL B. YOON and JEENEE S. YOON,<br><br>Debtors. | Case No.  19-42763 CN<br>Chapter 11 |
| DAN YOON,<br><br>        Plaintiff,<br><br>v.<br><br>K.S. AVIATION, INC., ET AL.,<br><br>        Defendants. | Adversary No.  20-4021 CN<br><br>**MEMORANDUM DECISION** |

On July 8, 9 and 10, 2024, the court conducted a three-day trial in this adversary proceeding.  All appearances were noted on the record.  Plaintiff Dan Yoon ("Plaintiff") seeks a judgment against defendants John Yoon ("Defendant Yoon"), K.S. Aviation ("KSA") and Xing Kong Aviation Service, LLC ("Xing Kong") for their alleged failure to repay a series of personal loans and failure to indemnify Plaintiff pursuant to the terms of a settlement agreement.  Plaintiff also seeks a judgment avoiding the transfer of all assets from KSA to Xing Kong, and from Xing Kong to defendant Xin Han

Aviation, LLC ("Xin Han").  Finally, Plaintiff seeks a finding that defendants Xing Kong, Xin Han and Chen Zhao ("Zhao") are liable on any judgment against KSA under an alter ego or a successor liability theory.

The following constitutes this court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a)(1), made applicable here by Fed.R.Bankr.P. 7052.

**FINDINGS OF FACT**

Plaintiff met Defendant Yoon at flight school in 2003.  At the time, Defendant Yoon was the sole shareholder of KSA.  In January 2004, KSA acquired a financially-troubled flight school, Sierra Academy of Aeronautics ("Sierra Academy"), which operated out of the Oakland Airport and primarily trained pilots for various Asian airlines.  In March 2004, Plaintiff contributed $500,000 in operating capital to KSA in exchange for 50% of KSA's stock.

Between 2005 and 2016, KSA substantially expanded and invested heavily in Sierra Academy's facilities and pilot training equipment.[1]  During this period, Plaintiff, Plaintiff's wife Jeenee Yoon ("Jeenee"), Sierra Air Center Development, LLC  (a KSA subsidiary ("SACD")), Hana Japan, Inc. and Hana Yoon, Inc. (entities controlled by Plaintiff and his family) and Shouchen Zhu (a friend of Plaintiff) loaned substantial sums to KSA and/or Defendant Yoon to a) purchase airplanes and other assets for Sierra Academy, b) fund the construction of a facility to house a Boeing 737 flight simulator, and c) cover other business expenses (together, the "Personal Loans").

In January 2012, SACD drafted a formal business plan which proposed the development of an EB-5 program[2] to attract additional funding. (the "EB-5 Program"). The business plan sought to attract investors to infuse up to $56 million for the development of a full-service "business aviation center for corporate and other general aviation aircraft

---

[1] By 2008, KSA had relocated Sierra Academy to the site of a decommissioned Air Force base in Atwater, California.

[2] Generally, an EB-5 program is a federal immigration program that enables foreign citizens to qualify for permanent resident status in exchange for capital investment in the United States.  Trial Tr. Day 2 at 29:20-23.

operators as well as passenger and air cargo operations" at Sierra Academy, and it proposed that SACD would provide freight services to ship agricultural goods from the Central Valley to Asia.[3] To that end, SACD expanded the fuel tank program to service larger aircraft and renovated its existing student dormitories.[4] The seed money for these projects came from KSA.[5]

Between 2012 and 2014, KSA also obtained three business loans totaling $1,213,665.90 from Bank of the West (the "Business Loans").[6] Plaintiff and Defendant Yoon guaranteed all three Business Loans.

KSA obtained additional funding to purchase a flight simulator. On December 11, 2013, SACD signed a contract to purchase a Boeing 737 flight simulator for $5 million (the "Simulator"). To help fund that purchase, SACD obtained a $1.5 million loan from Bank of the West and a $1,543,000 SBA loan from the Bay Area Employment Development Co ("BAEDC;" together, the "Simulator Loans"). The Simulator Loans closed in July 2014, and Plaintiff, Jeenee, Hana Japan, Inc. and KSA guaranteed those loans.

Plaintiff alleges that the total cost to purchase the Simulator was $5 million, and that an additional $308,708 was required to renovate the existing facility to house the Simulator, for a total cost of at least $5,308,70. Plaintiff asserts that the Simulator Loans, the Business Loans, and at least some of the Personal Loans were utilized to fund these expenses.

Plaintiff and Defendant Yoon's business relationship deteriorated significantly in 2014 and 2015. In mid-2015, Plaintiff caused KSA to terminate Defendant Yoon's

---

[3] Pl. Exh. 11; Trial Tr. Day 1 at 22-25; Trial Tr. Day 2 at 30:18-25.

[4] Trial Tr. Day 1 at 78:1-79:10; Trial Tr. Day 2 at 30:11-31:6; Trial Tr. Day 3 at 144:25-146:16.

[5] Trial Tr. Day 2 at 31:7-9.

[6] Loan #1 dated December 18, 2012, in the initial amount of $75,000, increased to $325,000 on December 13, 2013, and further increased to $400,000 on May 1, 2014; Loan #2 dated December 13, 2013, in the amount of $213,665.90; and Loan #3 dated May 1, 2014, in the amount of $600,000.

employment with KSA, which resulted in substantial litigation between the parties and in the Merced County District Attorney filing criminal fraud charges against Plaintiff.

In March 2016, KSA defaulted on the Business Loans and in June 2016, SACD defaulted on the Bank of the West Simulator Loan. In July 2016, Bank of the West sued Plaintiff, Jenee, KSA, SACD, Hana Japan, Inc. and Plaintiff's son for breach of the loan and guaranty agreements on the Business Loans and the Bank of the West Simulator Loan (the "Bank of the West Litigation").

In early September 2016, to resolve the pending civil litigation between them and to assist Plaintiff in his plea negotiations with the Merced County District Attorney, Plaintiff and Defendant Yoon (individually and on behalf of KSA) executed a settlement agreement (the "Settlement Agreement"). The Settlement Agreement required Plaintiff to, among other things, resign from KSA and surrender his KSA stock and all corporate property to KSA. In exchange, Defendant Yoon and KSA agreed to: (1) relinquish their interests in SACD and in the EB-5 Program to Plaintiff; (2) fully and unconditionally release all claims against Plaintiff;[7] (3) assume liability for and make payments on the Simulator Loans; and (4) indemnify Plaintiff should any loans for the "[S]imulator facility and its contents" become delinquent and creditors seek enforcement against Plaintiff. KSA further agreed to make certain payments to Plaintiff upon specific conditions precedent. Specifically, paragraph 2 of the Settlement Agreement provided,

> [A]ny funds owed to [Plaintiff] that are clearly and legally documented as official loans by [Plaintiff] to [KSA] will be determined by an accredited outside and neutral Certified Public Accountant. Such funds will be repaid once [KSA] has regained its financial footing and all past due debts are brough current, all pending judgements against [KSA] are resolved and that sufficient operating capital is on hand to meet current business requirements including updating of the aircraft fleet and maintenance operations.

Pl. Exh. 1 at ¶ 2. In accordance with the Settlement Agreement, Defendant Yoon took

---

[7] The Settlement Agreement also contained a substantial release from Plaintiff in favor of, among others, KSA and Defendant Yoon.

control of KSA's operations.

In late January 2017, Bank of the West, Plaintiff, Jeenee, and Hana Japan, Inc. reached a settlement of the Bank of the West Litigation whereby Plaintiff stipulated to entry of a $2,408,107 judgment against him, consisting of $965,000 for the Business Loans and $1.442 million for the Bank of the West Simulator Loan. Jeenee, Hana Japan, Inc. and SACD also stipulated to entry of a $1.442 million judgment on the Bank of the West Simulator Loan. The judgment was entered on February 27, 2017, and was secured by a deed of trust against Plaintiff and Jeenee's Pleasanton, California residence (the "Bank of the West Judgment"). Bank of the West executed against the Simulator, and its sale proceeds satisfied the Bank of the West Simulator Loan in full and paid all but $260,514.18 of the BAEDC Simulator Loan.

On March 1, 2017, Jenee, SACD, Hana Japan, Inc., Hana Yoon, Inc. and Shouchen Zhu assigned their interests in their respective Personal Loan promissory notes to Plaintiff. One day later, on March 2, 2017, Plaintiff filed a complaint against KSA in Merced County Superior Court (the "KSA Litigation"). Plaintiff subsequently amended the complaint to add Defendant Yoon, Xing Kong and Zhao as defendants. The complaint challenged the enforceability of the Settlement Agreement and sought a judgment against KSA and Defendant Yoon for their failure to repay all but $264,840 of the Personal Loans.[8] The Merced County Superior Court bifurcated the KSA litigation and resolved the first issue – the validity of the Settlement Agreement – by finding that it was enforceable. The Superior Court reserved the issue of its alleged breach and resulting monetary damages.

In August 2017, Defendant Yoon, KSA and Xing Kong entered into a Stock Purchase Agreement whereby Defendant Yoon agreed to sell his KSA stock to Xing

---

[8] Plaintiff amended his complaint several times after the Merced County Superior Court determined that the Settlement Agreement was enforceable, and the trial before this court proceeded on the claims asserted in Plaintiff's Fourth Amended Complaint. Plaintiff has never strayed from his argument that the Settlement Agreement entitles him to recover the unpaid balance of the Personal Loans, and he has not argued – either at trial or in his post-trial brief – that he can recover on the Personal Loans irrespective of the Settlement Agreement. The court presumes that the Plaintiff's decision not to pursue this line of argument is based on the Settlement Agreement's broad release terms.

Kong for $12,800,000, minus KSA's debts, expenses and taxes that were due as of the closing date.[9]  While the Stock Purchase Agreement never closed and no asset purchase agreement was signed by these parties,[10] KSA and Sierra Academy ultimately transferred the bulk of their assets to Xing Kong,[11] which then transferred some of these assets to Xin Han.[12]

By January 2019, Xing Kong had changed Sierra Academy's name to Xing Kong Aviation Service, LLC, dba Sierra Academy of Aeronautics, and was fully operating the business.  Xing Kong began receiving all of Sierra Academy's income and paying all of its ongoing operating expenses, including curing a substantial rent default with the County of Merced and agreeing to a payment plan with the Merced County Tax Collector.[13]  Since entering into the Stock Purchase Agreement, Xing Kong has also paid

---

[9] The $12.8 million price included $11 million in debt owed by KSA.  Zhao testified that Xing Kong paid a $300,000 deposit to Defendant Yoon prior to signing the Stock Purchase Agreement and paid another $250,000 on the day the Stock Purchase Agreement was executed.  Trial Tr. Day 2 at 180:10-182:8.

[10] Zhao testified that the Stock Purchase Agreement did not close due to Plaintiff's failure to turn over his stock certificates as required by the Settlement Agreement.  Trial Tr. Day 2 at 135:6-16.  He further testified that the Stock Purchase Agreement was amended to provide Defendant Yoon with an additional six months to obtain the stock certificates from Plaintiff.  *Id.* at 149:3-151:3.  The amendment provided that if Defendant Yoon did not obtain the stock certificates, any funds expended by Xing Kong to operate Sierra Academy and/or pay off KSA's debts in the interim would be converted into a loan from Xing Kong to KSA.  *Id.* at 151:6-13.  On cross-examination, Zhao testified that while Xing Kong initially booked the expenditures as loans, Xing Kong stopped doing so because it realized that KSA could not repay them.  Trial Tr. Day 3 at 51:3-52:7.

[11] Zhao testified that Xing Kong purchased some aircraft from creditors of KSA who had repossessed the planes.  He also testified that four aircraft remain registered in KSA's name.  Trial Tr. Day 2 at 156:13-157:10; 186:13-190:11.  Zhao further testified that he had also purchased planes not previously owned by KSA.  *Id.* at 156:13-157:11.

[12] Xin Han was formed to hold title to the planes acquired by Xing Kong and used by Sierra Academy.  Trial Tr. Day 2 at 154:9-25.  Zhao testified that the money to run Xing Kong was being loaned by his friend Xin.  Xin was given shares of Xin Han so that he would have tangible assets to provide a return on his investment.  *Id.* at 154:12-22.  He also testified, without further explanation, that part of the purpose of creating Xin Han was to protect the aircraft from litigation.  *Id.* at 157:13-15. See also Trial Tr. Day 3 at 57:5-64:25.

[13] Trial Tr. Day 1 at 75:8-25; 80:23-81:18.

on and/or satisfied various KSA's debts unrelated to its daily operating expenses.[14] Zhao testified that Xing Kong is losing money and has never been profitable.[15]

Plaintiff and Jeenee filed a Chapter 11 bankruptcy case on December 6, 2019, in which Bank of the West filed a proof of claim asserting a $1,148,868.82 secured claim based on the Bank of the West Judgment. On August 10, 2021, Plaintiff and Jeenee confirmed a chapter 11 plan which provided for payment of Bank of the West's claim in full, with interest, at the rate of $6,344.10 per month for fifty-nine months, and a balloon payment due at month sixty (September 1, 2026). The confirmed plan also provided for pro rata payment to BAEDC on the outstanding amount of its Simulator Loan from the proceeds of the sale of certain properties and recovery from the KSA Litigation.

In March 2020, Plaintiff removed the KSA Litigation to the United States Bankruptcy Court for the Eastern District of California, which then transferred the adversary proceeding to this court on May 1, 2020. Plaintiff's fourth amended complaint (filed on June 6, 2022) asserts the following claims for relief: (1) Defendants breached the Settlement Agreement and the Covenant of Good Faith and Fair Dealing by not repaying the Personal Loans; (2) Defendants breached the Settlement Agreement by failing to make the required payments on the Simulator Loans and by failing to indemnify Plaintiff for liability he incurred as a result of creditors enforcing his guaranty of the Simulator Loans and the Business Loans; (3) the transfer of KSA's assets to Xing Kong and from Xing Kong to Xin Han constituted fraudulent transfers under California law and violated section 17200, *et seq* of the California Business & Professions Code; and (4) Xing Kong, Xin Han and Zhao are liable any judgment obtained against KSA under the theories of successor liability and/or alter ego.

---

[14] Zhao testified that as of the date of trial, Xing Kong had paid $4 million of KSA's outstanding debt and that there was remaining KSA debt that it was paying and/or obligated to pay. Trial Tr. Day 2 at 182:9-184:9. Including payment of the KSA debts, Zhao testified that he has put in excess of $11 million into Xing Kong. Trial Tr. Day 1 at 80:1-5; 80:23-81:18; Trial Tr. Day 2 at 190:12-191:2**.**

[15] Trial Tr. Day 2 at 184:17-185:14; 191:5-9.

## CONCLUSIONS OF LAW

### Breach of Contract and of Covenant of Good Faith and Fair Dealing

Plaintiff argues he is entitled to a judgment against KSA[16] for breach of contract and breach of the covenant of good faith and fair dealing because of its failure to repay the Personal Loans. Resolution of this claim requires consideration of California contract law.[17]

The elements of a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result. *Coles v. Glaser*, 2 Cal.App.5th 384, 391 (Cal.Ct.App. 2016) (citation omitted). "The implied [covenant of good faith and fair dealing] requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the [contract]." *Avidity Partners, LLC v. State of California*, 221 Cal.App.4th 1180, 1204 (Cal.Ct.App. 2013) (citation omitted). The covenant is "implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefit of the contract." *Id*. The party alleging the breach bears the burden of proof on all its breach of contract claims. 23 WILLISTON ON CONTRACTS § 63:14 (4th ed. 2024). Similarly, the burden of establishing a breach of an implied covenant in a contract is on the party asserting it. *Id*. Finally, a party seeking to enforce a contract containing conditions precedent bears the burden of proof as to the occurrence of the conditions. *Id.*

The pertinent paragraph of the Settlement Agreement provides,

---

[16] The Fourth Amended Complaint also names Xing Kong as a defendant subject to liability on the Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing claims. As noted herein, both claims are effective only as to the contracting parties. Because Xing Kong was not a signatory to the Settlement Agreement, it has no liability for breach of that agreement or for breaching any covenant of good faith and fair dealing arising from that agreement. Xing Kong's liability, if any, will be addressed in the discussion of the alter ego and successor liability claims.

[17] Paragraph 21 of the Settlement Agreement provides that it "shall be governed by, interpreted and enforced according of the law of the State of California." Pl. Exh. 1 at ¶ 21.

[A]ny funds owed to [Plaintiff] that are clearly and legally documented as official loans by [Plaintiff] to [KSA] will be determined by an accredited outside and neutral Certified Public Accountant.  Such funds will be repaid once [KSA] has regained its financial footing and all past due debts are brough current, all pending judgements against [KSA] are resolved and that sufficient operating capital is on hand to meet current business requirements including updating of the aircraft fleet and maintenance operations.

Pl. Exh. 1 at ¶ 2.  The parties do not dispute that the Settlement Agreement is a "contract." Instead, the parties' disagreement focuses on the scope of the Settlement Agreement and whether KSA breached it.

Plaintiff asserts that he is entitled to repayment of both the loans he personally made to KSA ("Dan's Loans"), as well as the loans made by Jeenee, SACD, Hana Japan, Inc., Hana Yoon, Inc., and Shouchen Zhu, that were subsequently to Plaintiff (the "Third-Party Loans").  The court disagrees.

Under California law, a contract must be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting.  Cal.Civ.Code § 1636 (West 2024); *State of California v. Cont'l Ins. Co.*, 55 Cal.4th 186, 195 (2012).  The intention of the parties is to be determined from the written provisions of the contract alone, if possible. Cal.Civ.Code § 1639 (West 2024); *State of California v. Cont'l Ins. Co.,* 55 Cal.4th at 195. If the language of the contract itself is clear and explicit and does not involve an absurdity, it controls.  Cal.Civ.Code § 1638 (West 2024); *State of California v. Cont'l Ins. Co.*, 55 Cal.4th at 195.

There is no indication that the parties contemplated extending KSA's repayment obligation to the Third-Party Loans.  When the parties entered into the Settlement Agreement, the Third-Party Loans had been made, but they had not been assigned to Plaintiff.[18]  The plain language of the Settlement Agreement limits repayment to "official loans **by Dan** to [KSA]" (emphasis added).  Later in paragraph 2, the Settlement Agreement contemplates payments to "Dan Yoon and family" upon specified future

_____

[18] The Settlement Agreement was entered into in September 2016.  The Third-Party Loans were not assigned to Plaintiff until March 1, 2017.

events. The designation of some provisions as being applicable to Plaintiff only, and others being applicable to Plaintiff and family members shows that the parties knew how to differentiate between the two, and in fact did so. If the Settlement Agreement was intended to address the payment specifics of the Third-Party Loans, it would have so stated. Omission of the Third-Party Loans appears to have been intentional,[19] is consistent with Plaintiff's own testimony at trial,[20] and is conclusive. Thus, the court finds that, to the extent that Plaintiff is entitled to repayment of the Personal Loans, he is only entitled to recover on the loans he personally made. The Third-Party Loans are excluded under the plain language of the Settlement Agreement[21].

At trial, Plaintiff introduced various promissory notes into evidence.[22] Pl. Exh. 2. Pursuant to the discussion above, the court finds that Dan's Loans are comprised only of the following loans made by Plaintiff to KSA: (1) Promissory Note dated December 30, 2005, in the amount of $603,713.04; (2) Promissory Note dated December 31, 2009, in the amount of $656,710; and (3) Promissory Note dated August 26, 2010, in the amount of $255,670.[23] The principal amount of Dan's Loans, exclusive of interest and any

---

[19] *See* Pl. Exh 101 at 70:12-84:19 (trial testimony of Lance Lippincott wherein he testified that Plaintiff's lawyer reviewed the Settlement Agreement and provided edits).

[20] Tr. Transcript Day 2 at 56:6-12.

[21] Stated differently, this court is not determining the extent to which KSA was liable on the assigned Personal Loans before they were assigned to Plaintiff. Plaintiff's theory of the case was that the assigned Personal Loans became "official loans by Dan" and thus fall within the terms of the Settlement Agreement. For the reasons stated, the court rejects this argument.

[22] In response to the court's inquiry, both parties agree that the existence of the promissory notes is sufficient to demonstrate that Dan's Loans were funded.

[23] Plaintiff's Exhibit 2 contains a promissory note dated December 30, 2008, in the amount of $270,000, from Defendant Yoon to Plaintiff. The court has not included this promissory note in its calculations of Dan's Loans because Defendant Yoon was not named as a defendant in the breach of contract/breach of covenant of good faith and fair dealing claims. The only parties named were KSA and Xing Kong. Plaintiff has not moved to amend the complaint to conform with the proof and the court declines to do so *sua sponte*, particularly given Plaintiff's repeated motions to amend his complaint.

Plaintiff's Exhibit 2 also contains a promissory note dated May 20, 2016, in the amount of $406,689.26, from KSA to Plaintiff. The court has not included this promissory note in its calculation of Dan's Loans because the promissory note states that it is intended

repayment,[24] totals $1,516,093.

Under the Settlement Agreement, the prerequisites for payment of Dan's Loans were: (1) clear and legal documentation of official loans by Dan to KSA as determined by an accredited outside and neutral CPA; and (2) KSA becoming profitable.[25]

The parties did not hire an outside and neutral CPA, thus no determination was ever made as to which, if any, of Dan's Loans were "official loans" subject to repayment under the Settlement Agreement.[26] They disagree about which party had the burden to hire the

---

to be a salary equalization payment to reflect salary that Defendant Yoon allegedly received, and that Plaintiff believes he should have also received. *See*, Trial Tr. Day 1 at 104:22-105:106:9; 108:3-6 and Trial Tr. Day 2 at 108:22-110:8. Pursuant to the plain language of the Settlement Agreement, the court finds that this salary equalization payment does not constitute a "[loan] by Dan."

[24] Plaintiff concedes that he has been repaid $264,840. Pl. Tr. Brief, Dkt. # 294 at 8:13-14. Defendants argue that Dan's Loans total only $370,000 and they have been repaid in full via conversion of the loan liabilities to common stock. Trial Tr. Day 2 at 11:3-14:18; Defs. Post Trial Brief, Dkt. # 326 at 24:15-25:10. The court need not determine the extent of any repayment because Plaintiff has failed to establish that the conditions precedent to payment have been satisfied.

[25] The Settlement Agreement provided that any of Dan's Loans determined to be official loans by the neutral CPA "will be repaid once [KSA] has regained its financial footing and all past due debts are brought current, all pending judgements against [KSA] are resolved and that sufficient operating capital is on hand to meet current business requirements including updating of the aircraft fleet and maintenance operations." Pl. Exh. 1 at ¶ 2. At trial, Plaintiff conceded that the phrase KSA "has regained its financial footing" meant that KSA had become profitable. Trial Tr. Day 2 at 58:5-7. Judge Hansen described this provision more broadly, finding, "[B]oth [Defendant Yoon and Plaintiff] agreed that making any future payments was within the discretion of the [KSA] Board of Directors and/or the new investor. [Plaintiff] could challenge the denial of any payments only if he could prove that all [KSA] debts and judgments had been paid, the company was profitable and growing and that the board and/or the investor acted in bad faith." Defs. Exh. AJ at 9:27-10:3.

[26] In his post-trial brief, Plaintiff argues that Jeffrey Lee was the neutral certified CPA contemplated by the Settlement Agreement. Plaintiff reasons that Mr. Lee is a registered CPA who provided tax and accounting services to KSA in 2010 and 2011, and at Defendant Yoon's request, prepared a summary of amounts Plaintiff was allegedly owed by KSA in 2016 or 2017. The court rejects this argument. While an earnest witness, Mr. Lee was not credible. At trial, he admitted to suffering from memory loss that had caused him to retire. While he did testify that he remembered preparing a couple of promissory notes for Plaintiff, when presented with specific documents, Mr. Lee could not remember the details or if he had prepared them. More importantly, Mr. Lee testified that he did not remember the results of the summary he had prepared, did not know where it was, and, in any event, did not independently review any loan documents in preparing the summary. Tr. Transcript Day 1 at pp. 176-189.

CPA and the implication of the failure to do so.[27] Thus, it is left to the court to resolve this dispute.

The Settlement Agreement itself is silent as to which party was required to hire the CPA. It does, however, contain an Ambiguities or Uncertainties clause which provides that any ambiguities or uncertainties "shall be equally and fairly interpreted and construed without reference to the identity of the party or parties who prepared this document, on the express understanding and agreement that the parties participated equally in the negotiation and preparation of the Agreement[.]"[28] Based on the plain language of the Settlement Agreement, the starting point is that both parties are equally responsible to hire the CPA.

Under California law, "even when the uncertainty of a written contract goes to 'the precise act which is to be done' . . . , extrinsic evidence is admissible to determine what the parties intended." *Okun v. Morton*, 203 Cal.App.3d 805, 819 (Cal.Ct.App. 1988) (citations omitted). Plaintiff argues that it was KSA's burden to hire a neutral CPA and that it breached the Settlement Agreement by failing to do so. The only evidence on this point is Plaintiff's testimony at trial that "they told me that they going taken care of it." Tr. Transcript Day 1 at 155:25-156:1. This testimony is not compelling. First, Judge Hansen previously found that Plaintiff is not a credible witness.[29] This court's impression is consistent with Judge Hansen's conclusion. Plaintiff's testimony at trial was evasive and self-serving. More importantly, his testimony is completely at odds with the facts surrounding the Settlement Agreement and with common sense. Of the two parties, Plaintiff was the party that had a vested interest in retaining the CPA – he was the party who wanted to be paid by KSA and verification of his loans was a prerequisite. Plaintiff claims that he could not have hired the CPA because he was not in possession of KSA's

---

[27] Judge Hansen previously rejected Plaintiff's argument that the provision requiring hiring of an outside neutral CPA was illusory and determined that the clause is enforceable. Defs. Exh. AJ at 8:23-9:2; 12:14. Judge Hansen did not determine who bore the burden of retaining the CPA.

[28] Pl. Exh. 1 at p. 7, ¶ 24.

[29] Defs. Exh. AJ at 4:8.

records.[30] Plaintiff fails to explain why he would not have his own personal records of any loans he made to KSA (including the promissory notes that he presented at trial). It strains credulity to believe that Plaintiff – an experienced and apparently successful businessman[31] - loaned substantial sums to KSA yet kept no records of his own. It is equally unbelievable that when his relationship with Defendant Yoon soured in the period leading up to the Settlement Agreement, Plaintiff did not secure copies of any records necessary to protect himself or his alleged investments. Further, the evidence does not explain why Plaintiff never suggested a proposed neutral CPA.[32] Plaintiff could have proposed a CPA and then the burden would have been on KSA to object or proffer a different CPA and participate in the accounting or not. Failure to participate would have given Plaintiff a clear cause of action for breach of the Settlement Agreement. Instead, Plaintiff did nothing. Plaintiff argues that it made little sense for him to hire a CPA to verify the validity of loans he asserted were valid. This argument is nonsensical. The Settlement Agreement required the hiring of an accredited, outside, and neutral CPA as a condition to repayment. The intent was for Plaintiff and KSA (through Defendant Yoon) to agree on the CPA[33] and the purpose was to have an independent third party determine whether the loans were valid. Plaintiff's belief in the validity of the loans would have been of no value or import.

Ultimately, it was Plaintiff who required an independent CPA to verify the loans as a prerequisite to payment. Thus, the court concludes that it was his burden to hire the CPA. His failure to do so necessarily dooms his breach of contract claim.

The parties agree that KSA never became profitable as required by the Settlement

---

[30] At trial, there was testimony that the IRS raided KSA in 2016 and took the corporate accounting records. Trial Tr. Day 3 at 46:10-47:10. However, those records were subsequently returned. Trial Tr. Day 3 at 124:24-125:8. Plaintiff never explained why he did not seek or obtain those records in discovery.

[31] Trial Tr. Day 1 at 85:11-24; Defs. Exh. AJ at 5:12-17.

[32] Trial Tr. Day 2 at 56:22-57:3.

[33] Trial Tr. Day 2 at 56:13-21.

Agreement.[34]   This concession would seemingly also undermine Plaintiff's breach of contract claim for relief.  Plaintiff alleges, however, that KSA's breach of the covenant of good faith and fair dealing waived this provision of the Settlement Agreement.  The court again disagrees.

As noted previously, the covenant of good faith and fair dealing is breached when one party "unfairly frustrat[es] the other party's right to receive the *benefits of the agreement actually made*."  *Avidity Partners, LLC v. State of California*, 221 Cal.App.4th at 1204 (citations omitted) (emphasis in original).   The covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Id.*  Here, the parties' collective "benefit of the agreement actually made" were KSA's hopeful return to profitability and repayment of Dan's Loans.   The court first notes that the Settlement Agreement specifically contemplated that KSA might seek additional investors to assist it in its return to profitability, and the agreement did not limit the type or extent of such an investment.[35] Accordingly, the Stock Purchase Agreement providing for the purchase by Xing Kong of 100% of KSA's stock was fully within the scope of the Settlement Agreement and did not violate the covenant of good faith and fair dealing.

The Stock Purchase Agreement, however, never closed.  Plaintiff argues if it had, "all debts of KSA would have been paid in full and thus the obligation to repay triggered." Plaintiff's Post-Trial Brief at 16:8-11.[36]  This argument is entirely speculative and ignores the fact that under the Settlement Agreement, payoff of KSA's debts was only one of the

---

[34] Trial Tr. Day 1 at 26:17-27:24.

[35] Pl. Exh. 1 at p. 2 (payment to Plaintiff and family "to be determined by the board of directors and **any future investors**"; "when if and as an investor [sic] purchases equity in [KSA], the investor will have the right to determine the amount of funds given to Dan Yoon") (emphasis added); *see also*, Defs. Exh. AJ at 9:23-10:1.

[36] Plaintiff's Post-Trial Brief cites to Pl. Exh. 6 to support this allegation.  Trial Exhibit 6 is a Complaint by Bank of the West against KSA, Plaintiff and others for Breach of Promissory Notes and Breach of Guaranties.   The court does not know how this document supports Plaintiff's argument and Plaintiff has not provided any explanation or clarification.

elements needed to trigger repayment and that full satisfaction of KSA's debts would not have necessarily met the several other requirements.[37]  It further ignores the fact that the Stock Purchase Agreement failed to close because Plaintiff refused to turn over his KSA stock shares as required by the Settlement Agreement.[38]  And it fails to acknowledge that notwithstanding Plaintiff's refusal to turn over his KSA shares, KSA and Xing Kong still sought to salvage their transaction. As stated above, KSA and Xing Kong amended the Stock Purchase Agreement to provide, among other things, that if Plaintiff did not turn over his shares, Xing Kong could force KSA to buy back the shares it had already purchased and indemnify Xing Kong for all damages, including any payments or loans made pursuant to the Stock Purchase Agreement.[39]  Ultimately, Xing Kong spent substantial sums of money trying to keep KSA afloat[40] while Plaintiff refused to turn over the stock shares.  If anyone was the offending party, it was Plaintiff, who refused to turn over the KSA shares for more than six years[41] and thus prevented KSA from consummating the Stock Purchase Agreement.[42]  Plaintiff's claim for breach of the covenant of good faith and faith dealing accordingly fails.

Because Plaintiff failed to prove a breach of the Settlement Agreement and failed to prove a breach of the covenant of good faith and fair dealing, KSA is entitled to judgment in its favor on these claims for relief.

**Breach of Contractual Indemnity**

Plaintiff argues that KSA and Defendant Yoon were required under the Settlement

---

[37] The other elements included resolution of all pending judgments and having sufficient operating capital on hand to meet current business requirements, including updating of the aircraft fleet and maintenance operations.  Pl. Exh. 1 at p. 2.

[38] Trial Tr. Day 2 at 135:6-16.

[39] Pl. Exh. 83.

[40] Defs. Exh. AJ at 9:25-26.

[41] Memorandum Decision re: Plaintiff's Motion for Partial Summary Judgment at docket # 190 at 5:11-16.

[42] Plaintiff's belated compliance was far too little too late.

Agreement to indemnify him for debts related to the Simulator facility and its contents and that their failure to reimburse him breached this clause of the Settlement Agreement.[43]

Express indemnity refers to an obligation that arises "by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances." *Prince v. Pac. Gas & Elec. Co.*, 45 Cal.4th 1151, 1158 (2009) (citations omitted). Express indemnity is "generally not subject to equitable considerations. . . it is enforced in accordance with the terms of the contracting parties' agreement." *Id.* Express indemnity "allows contracting parties 'great freedom to allocate [indemnification] responsibilities as they see fit[.]'" *Id.* A cause of action for breach of an express indemnity agreement accrues when the indemnified party sustains a loss by paying a judgment or settlement as to which he is entitled to indemnity. *Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.*, 238 Cal.App.4th 468, 481 (Cal. Ct. App. 2015).

The Settlement Agreement provides, "In recognition of [Plaintiff's] agreement that [KSA] owns the [S]imulator facility and its contents; [Defendant Yoon and KSA] agree to indemnify [Plaintiff] should the loans for said items become delinquent and the creditors seek enforcement against [Plaintiff]."[44] Plaintiff contends that under this provision, KSA and Defendant Yoon must indemnify him for both the Simulator Loans and the Business Loans. The court will discuss each in turn.

As noted previously, the Simulator Loans consisted of a $1.5 million loan to SACD from Bank of the West and a $1.543 million loan to SACD from BAEDC. In his trial brief, Plaintiff conceded that the Bank of the West loan was satisfied in full through the

---

[43] The Fourth Amended Complaint names Xing Kong as a defendant subject to liability on the Breach of Contractual Indemnity claim. As noted previously, this claim is effective only as to the contracting parties. Because Xing Kong was not a signatory to the Settlement Agreement, it has no liability for breach of the agreement. Xing Kong's liability, if any, will be addressed in the discussion of the alter ego and successor liability claims.

[44] Pl. Exh. 1 at p. 3, ¶ 4.

foreclosure sale of the Simulator.[45]  Thus, there are no damages to indemnify.  The court previously granted summary judgment as to the BAEDC loan and found KSA and Defendant Yoon were liable to Plaintiff under the indemnification provision for damages in the amount of $260,514.18.[46]

Plaintiff asserts that the Business Loans are also subject to indemnification under this provision of the Settlement Agreement because the proceeds were used to pay: (1) the balance of the cost to purchase the Simulator; (2) the cost of improvements to the facility to house the Simulator; and (3) the cost to install the Simulator in the facility.  Initially, the court notes that it is undisputed that the Business Loans became delinquent, and Bank of the West sought enforcement against Plaintiff as contemplated by his guarantee of those obligations.  The court also agrees that to the extent the proceeds of the Business Loans were used to pay for the "[S]imulator facility and its contents" the indemnification provision of the Settlement Agreement is implicated.[47]  The court disagrees, however, that Plaintiff satisfied his burden to prove that the Business Loan proceeds were used in such a manner.

Plaintiff asserts that the total cost for SACD to buy and install the Simulator (including construction on the Simulator facility) was $5,308,708 – comprised of a $5 million purchase price for the Simulator itself plus at least $308,708 in construction costs. Plaintiff further asserts that the Simulator Loans were insufficient to cover the purchase price, thus the balance of the Simulator purchase price, plus any installation costs and construction costs to update the Simulator facility necessarily came from the proceeds of the Business Loans.  The sole documentary evidence to support this contention is Plaintiff's

---

[45] Plaintiff's Trial Brief, Dkt. #294 at 3:6-15.

[46] Memorandum Decision re: Plaintiff's Motion for Partial Summary Judgment, Dkt. #190 at 12:6-8.

[47] The Settlement Agreement provides, "In recognition of Dan's agreement that [KSA] owns the [**S]imulator facility and its contents**; [Defendant Yoon and KSA] agree to indemnify [Plaintiff] should **the loans for said items** become delinquent and the creditors seek enforcement against [Plaintiff]."  Pl. Exh. 1 at p. 3, ¶ 4 (emphasis added). The phrase "the loans for said items" refers back to the only items detailed in that provision – i.e., the "[S]imulator facility and its contents."

testimony and two bids for construction work totaling $308,708.[48] As noted previously, the court found Plaintiff to be less than forthcoming as a witness and discounts his testimony accordingly. Regarding the bids, they were just that. There is no evidence that these specific bids were accepted, work was completed pursuant to these bids, or to the extent that the bids were accepted and the work completed, that the final cost was consistent with the bids and paid from the proceeds of the Business Loans.[49] Apparently recognizing the defects in the evidence presented, Plaintiff asks this court to "infer" that the Business Loans were used to purchase and install the Simulator based on: (1) the fact that no other sources of funding were identified; and (2) the timing of the Business Loans. It is inappropriate for the court to make such an inference. It is Plaintiff's burden to prove how the Business Loans were used and that they were subject to the indemnity clause of the Settlement Agreement. A failure of proof does not result in an inference to the contrary. Equally important, the facts do not support such an inference. At trial, Plaintiff was evasive about the source of funds for the EB-5 program construction that was occurring concurrently with the Simulator facility construction.[50] Plaintiff also testified that some portion of the Personal Loans was used to pay for construction of the Simulator building[51] and acknowledged that in 2014, KSA had an operating profit of approximately $1 million and routinely had over $1.5 million in its bank account.[52] Further, because KSA was receiving funds from multiple sources and the Business Loans proceeds were apparently

---

[48] Pl. Exh. 14.

[49] At trial, Defendants' counsel objected to the bids on hearsay grounds. Plaintiff's attorney conceded that the bids were not evidence that the work was actually done. Instead, they were simply intended to serve as evidence that construction bids were received and that Plaintiff was president of KSA when those bids were obtained. Trial Tr. Day 1 at 128:3-129:24.

[50] Trial Tr. Day 2 at 122:7-126:2; 132:9-23.

[51] Trial Tr. Day 1 at 101:10-104:15; 144:11-17; Trial Tr. Day 2 at 100:5-102:3. The amount of these loans totaled $274,517.

[52] Trial Tr. Day 1 at 144:4-7; Trial Tr. Day 2 at 118:2-8; *see also*, Trial Tr. Day 3 at 131:1-132:8 ; Defs. Exhs. K and M.

commingled in KSA's accounts,[53] absent a forensic accounting or evidence of KSA's financial records there is no way to determine whether or how much of the Business Loans proceeds were used to fund the purchase of the Simulator and construction of the Simulator facility. Additionally, because the timeframe of the Business Loans overlapped with the timeframe of many of the Personal Loans, the timing of the Business Loans is not instructive. Finally, Plaintiff admitted that there were individuals that had personal knowledge of how the funds were spent, but he failed to call them as witnesses.[54] Ultimately, it was Plaintiff's burden to show that the Business Loans were used, in specific amounts or in full, to purchase and install the Simulator. He failed to sustain this burden. As a result, his claim for breach of contractual indemnity as to the Business Loans fails.

For the foregoing reasons, the court finds Plaintiff is only entitled to judgment against KSA and Defendant Yoon in the amount of $260,514.18 for their breach of the indemnification provision of the Settlement Agreement as to the BAEDC Simulator Loan.

Plaintiff argues that his indemnification damages should also include his Chapter 11 attorneys' fees. The court disagrees. Plaintiff acknowledges that his "Chapter 11 bankruptcy filing was made in direct response to collection proceedings initiated by [Bank of the West]."[55] The court is unaware of any collection action by BAEDC and Plaintiff does not cite BAEDC as a reason for his decision to file bankruptcy. Since Plaintiff's indemnification recovery is limited to the unpaid BAEDC Simulator loan, and because this loan was not the underlying reason for his Chapter 11 filing, this court declines to include his attorney's fees in any indemnification recovery.

Plaintiff's remaining claims seek to either avoid transfers and impose a constructive trust for the purpose of collecting any judgment against KSA, or to extend liability for any judgment to Xing Kong, Xin Han and/or Zhao.

---

[53] Trial Tr. Day 1 at 144:18-24.

[54] Trial Tr. Day 1 at 145:14-146:5.

[55] Pl. Post-Trial Brief, Dkt. #327 at 10:28-11:2.

**Fraudulent Transfers**

Plaintiff alleges that KSA's transfers of assets to Xing Kong constitute fraudulent transfers subject to avoidance pursuant to California Civil Code § 3439.05. Civil Code § 3439.05 provides,

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or became insolvent as a result of the transfer or obligation.

Cal.Civ.Code § 3439.05(a) (West 2024). Plaintiff bears the burden of proving the elements of this claim for relief by a preponderance of the evidence. Cal.Civ.Code § 3439.05(b) (West 2024).

Plaintiff alleges that KSA transferred substantially all of its assets to Xing Kong without receiving reasonably equivalent value. To determine whether the transfers are fraudulent, the court must first determine the value of the assets KSA transferred and the value it received in return. The court must then determine whether the value received is reasonably equivalent to the value transferred. "'Reasonable equivalence' does not require exact equality in value." *Kendall v. Carbaat and Newcomb (In re Carbaat)*, 337 B.R. 553, 560 (Bankr. N.D.Cal. 2006) (citations omitted).

It is undisputed that at some point after the Stock Purchase Agreement was executed, KSA transferred substantially all its assets and business operations to Xing Kong. It is also undisputed that after the Stock Purchase Agreement was executed, Xing Kong funneled millions of dollars into operating Sierra Academy and into assuming and satisfying various of Sierra Academy and KSA's liabilities. What is missing is any evidence regarding the value of the assets transferred. The only evidence Plaintiff produced were the FAA registration files for various aircraft.[56] Those files do not contain any representations as to the value of the planes when Xing Kong and/or Xin Han obtained them. They also fail to account for Zhao's uncontroverted testimony at trial that: (1) at

---

[56] Pl. Exhs. 26-60.

least some of the planes were acquired by Xing Kong directly from the creditors that repossessed them; and (2) four of the planes are still owned by KSA.[57]  To the extent that Plaintiff asserts that any other assets were transferred, he failed to identify the assets and did not produce any evidence as to the value.  Thus, Plaintiff has failed to prove that KSA did not received reasonably equivalent value from Xing Kong by a preponderance of the evidence, and Plaintiff's claim for fraudulent transfer as to Xing Kong fails.

Plaintiff also seeks to avoid the transfers of 35 planes from KSA and Xing Kong to Xin Han on the ground that the transfers constituted actual fraud and are avoidable pursuant to California Civil Code § 3439.04.  Civil Code § 3439.04 provides, "A transfer made . . . by a debtor is voidable as to a creditor. . . if the debtor made the transfer . . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor.  Cal.Civ.Code § 3439.04(a)(1) (West 2024).[58]  Whether there is an actual intent to hinder, delay, or defraud is a question of fact to be determined by a preponderance of the evidence.  *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 235 (9th Cir. BAP 2007).  Because direct evidence of intent to hinder, delay and defraud is rare, California Civil Code § 3439.04(b) lists eleven non-exclusive factors that are typically regarded as circumstantial badges of fraud that are probative of intent.[59]

---

[57] Trial Tr. Day 2 at 156:13-157:10; 186:13-190:11.  The remainder of the aircraft were purchased by Zhao.  *Id.* at 156:13-157:11.

[58] Civil Code §3439.04 also provides for avoidance of a transfer where creditor shows constructive fraud.  *See* Cal.Civ.Code § 3439.04(a)(2).  Plaintiff did not allege constructive fraud and the court will not address it.

[59] (1) Whether the transfer or obligation was to an insider; (2) Whether the debtor retained possession or control of the property transferred after the transfer; (3) Whether the transfer or obligation was disclosed or concealed; (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) Whether the transfer was of substantially all the debtor's assets; (6) Whether the debtor absconded; (7) Whether the debtor removed or concealed assets; (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) Whether the transfer occurred shortly before or shortly after a substantial

Plaintiff argues that intent to defraud was established when Zhao testified that Xin Han was formed for the express purpose of holding title to planes used by Sierra Academy despite Xing Kong having full control over the aircraft and paying for all expenses except registration. Plaintiff further argues that Zhao admitted that Xin Han was formed solely to shield the planes from potential judgment creditors. Plaintiff's argument cherry-picks testimony that, in a vacuum, is damning, but in context, is decidedly less so. Specifically, Plaintiff ignores Zhao's testimony that he has borrowed significant sums of money from his friend Xin to run Xing Kong. Zhao testified that Xin has not seen any return on his investment, so Zhao created Xin Han to hold title to the planes and gave Xin an ownership interest, thereby ensuring that Xin would have a tangible return on his investment, and presumably, would continue to invest.[60] Zhao also testified that he believed – incorrectly - that there would be tax savings if the planes were held by Xin Han, a Montana entity and subject to Montana tax.[61] The court cannot find that Xin Han was acting with the actual intent to hinder, delay, or defraud a creditor, especially where its actions were intended to entice Xin to continue investing in Xing Kong and to minimize tax liability, all in an attempt to make Xing Kong profitable. Thus, Plaintiff's claim under California Civil Code § 3439.04 fails.

**Business and Professions Code § 17200, *et seq.***

Plaintiff alleges that because the transfer of assets from KSA to Xing Kong was a fraudulent transfer in violation of Cal. Civ. Code § 3439, it also constituted a violation of California's unfair competition law found in Business and Professions Code § 17200, *et seq,* (the "UCL"). As a result, Plaintiff requests the court to impose a constructive trust on any fraudulently transferred assets.

The UCL "prohibits, and provides civil remedies for, unfair competition, which it

---

debt was incurred; and (11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor. Cal.Civ.Code § 3439.04(b)(1)-(11) (West 2024).

[60] Trial Tr. Day 2 at 154:9-25; Trial Tr. Day 3 at 68:24-69:3.

[61] Trial Tr. Day 3 at 68:17-23.

defines as 'any unlawful, unfair or fraudulent business act or practice.'" *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 320 (2011). Its purpose is to protect consumers and competitors by promoting fair competition in commercial markets for goods and services. *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 949 (2002) (citations omitted). The scope of the UCL is broad and permits violations of other laws to be treated as "unfair competition" that is independently actionable. *Id.* The remedies under the UCL are limited to injunctive relief and restitution. *Marble Bridge Funding Group, Inc. v. Euler Hermes Am. Credit Indem. Co.*, 225 F.Supp.3d 1034, 1045 (N.D. Cal. 2016).

Here, Plaintiff alleges that the violation of the UCL is the fraudulent transfer of assets from KSA to Xing Kong. Because the court has found that Plaintiff has not sustained his burden of proof to show that the transfer of assets from KSA to Xing Kong constituted a fraudulent transfer, Plaintiff's UCL claim also fails.

Based on the foregoing, the court finds that Plaintiff is only entitled to a judgment against KSA and Defendant Yoon in the amount of $260,514.18 for their breach of the indemnification provision of the Settlement Agreement as to the BAEDC Simulator Loan (the "Judgment"). Plaintiff's two remaining claims seek to extend the liability on this Judgment to Xing Kong, Xin Han and/or Zhao.

**Successor Liability**

The general rule is that "where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former[.]" *Franklin v. USX Corp.*, 87 Cal.App.4th 615, 621 (Cal.Ct.App. 2001). Successor liability is an equitable doctrine that extends liability on a cause of action to the successor corporation where "(1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for debts." *Id.; see also*, *Brown Bark III, L.P. v. Haver*, 219 Cal.App.4th 809, 822 (Cal.Ct.App. 2013) (citation omitted).

Plaintiff alleges that liability for the Judgment should be extended to Xing Kong under the third basis for successor liability – i.e., Xing Kong is merely a continuation of

KSA. Courts impose this liability where "a corporation reorganizes under a new name but with practically the same stockholders and directors and continues to carry on the same business[.]" *Beatrice v. State Bd. of Equalization*, 6 Cal.4th 767, 778-79 (1993) (citations omitted). To impose liability on this basis, Plaintiff is required to prove: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; and/or (2) one or more persons were officers, directors, or stockholders of both corporations (i.e., a unity of officers and directors). *Cleveland v. Johnson*, 209 Cal.App.4th 1315, 1327 (Cal.Ct.App. 2012). "'[I]t is appropriate to examine successor liability issues on their own unique facts' and '[c]onsiderations of fairness and equity apply.'" *Id.* at 1330.

As to the first element, as noted previously, Plaintiff failed to prove that no adequate consideration was given for KSA's assets or was made available for meeting the claims of KSA's unsecured creditors.

As to the second element, there is a unity of officers and directors between KSA and Xing Kong. In his deposition, Zhao testified that he became President of KSA once he signed the Stock Purchase Agreement and that he and Defendant Yoon are the two directors.[62] Zhao is also the President, officer and sole member of Xing Kong.[63] Zhao further testified that as of August 2022, there had been no change to his titles at KSA or Xing Kong.[64] However, it is not dispositive that some of the same people may serve as officers or directors of the two corporations. "[E]ven when the same persons are officers or directors of the two corporations, liability is not imposed on the acquiring corporation when recourse to the debtor corporation is available and the two corporations have separate identities." *Beatrice Co. v. State Bd. Of Equalization*, 6 Cal.4th at 778; *see also, CenterPoint Energy, Inc. v. Sup.Ct.*, 157 Cal.App.4th 1101, 1121 (Cal.Ct.App. 2007). The evidence at trial established conclusively that Xing Kong and KSA are not separate entities

---

[62] Pl. Exh. 99 at 55:10-25.

[63] Pl. Exh. 100 at 5:7-6:3.

[64] Trial Tr. Day 2 at 152:3-13.

and recourse to KSA is unavailable.  Zhao has the authority to control KSA and Xing Kong.[65]  Following the execution of the Stock Purchase Agreement, Xing Kong acquired virtually all of KSA's assets either directly or indirectly.  The only assets that appear not to have been transferred were four planes that, as of the trial date, remain titled to KSA, but appear to be used by Xing Kong in its operation of Sierra Academy.  Zhao also testified that at all times after the Stock Purchase Agreement was executed, Xing Kong operated KSA – including infusing millions of dollars to operate Sierra Academy, hire KSA's employees and pay its operating and non-operating liabilities.  As a result of the Stock Purchase Agreement, KSA has few assets, has no current operations or ability to operate, and is simply a shell of a corporation.  Thus, Plaintiff has satisfied the unity of officers and directors element.  Liability on the Judgment shall be extended to Xing Kong under the theory of Successor Liability.

**Alter Ego**

Plaintiff alleges that Xing Kong, Xin Han and Zhao should also be responsible for the Judgment under an alter ego theory.

Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its shareholders, officers and directors, and with separate and distinct liabilities and obligations.  *Sonora Diamond Corp. v. Sup. Court*, 83 Cal.App.4th 523, 538 (Cal.Ct.App. 2000).  "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.  In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation. . . . The purpose of the doctrine is to bypass the corporate entity for the sole purpose of avoiding injustice."  *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F.Supp.2d 1060, 1066 (C.D. Cal. 2002) (internal citation omitted).  While alter ego is typically used to extend liability to individual shareholders, it may also be used to extend liability to another corporation where the corporation "is so organized and controlled, and its affairs are so conducted, as

---

[65] Pl. Exh. 99 at 6:9-11 and Exh. 100 at 6:6-8.

to make it merely an *instrumentality, agency, conduit, or adjunct of another corporation."* *Las Palmas Assocs. v. Las Palmas Center Assocs.*, 235 Cal.App.3d 1220, 1249 (Cal.Ct.App. 1991) (citations omitted) (emphasis in original). Alter ego is an extreme remedy and should be used sparingly. *Sonora Diamond Corp.*, 83 Cal.App.4th at 538. The Plaintiff bears the burden of proving alter ego by a preponderance of the evidence. *Wady*, 216 F.Supp.2d at 1066; *Wollersheim v. Church of Scientology*, 69 Cal.App.4th 1012, 1017 (Cal.Ct.App. 1999).

Two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder no longer exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. *Sonora Diamond Corp.*, 83 Cal.App.4th at 538 (citations omitted). Among the factors to be considered are: (1) commingling of funds and other assets of the two entities; (2) the holding out by one entity that it is liable for the debts of the other; (3) identical equitable ownership in the two entities; (4) use of the same offices and employees, (5) use of one as a mere shell or conduit for the affairs of the other; (6) inadequate capitalization; (7) disregard of corporate formalities; and (8) lack of segregation of corporate records. *Id.* at 538-39. "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Id.* at 539.

The court finds that alter ego liability for the Judgment should be imposed on Xing Kong. First, there is a unity of interest and ownership between KSA and Xing Kong such that the separate personalities of the KSA and Xing Kong no longer exist. Zhao is the owner of both. Zhao testified that due to the delay in Plaintiff turning over his shares of KSA stock, a decision was made to "leave [KSA] on the side and then start running things under Xing Kong."[66] As a result, Xing Kong's assets and business are the former assets

---

[66] Trial Tr. Day 2 at 185:2-6.

and business of KSA and Sierra Academy.[67]  Second, it would be inequitable not to impose alter ego liability.  As a result of the transfer of most of KSA's assets and business operations to Xing Kong, KSA is now a defunct entity, owing only four planes – which are also used by Xing Kong and Sierra Academy.  Moreover, inherent in Zhao's testimony that it was decided to leave KSA and run everything through Xing Kong is an admission that the two entities were treated as one in the same.  Thus, alter ego liability is appropriate.

Alter ego liability for the Judgment is also appropriate as to Xin Han.  Xin Han, for all material intents and purposes, is Xing Kong.  Zhao is the sole or controlling individual for both and they are both operated out of the same airfield.[68]  Xin Han's sole purpose is to hold title to planes purchased, used, and maintained by Xing Kong.[69]  Xin Han does not have any contracts or lease agreements with Xing Kong and receives no money for the use of the planes.[70]  There is such a unity of interest and ownership between Xing Kong and Xin Han that they are one in the same.  Because of this, it would be inequitable not to impose alter ego liability to Xin Han when imposing it on Xing Kong.[71]

Finally, alter ego liability for the Judgment is not appropriate as to Zhao.  At trial, there was no testimony elicited or evidence presented about Zhao personally or about his personal finances.  There is no allegation that Zhao treated KSA's assets as his own or that he commingled his personal funds with KSA's funds.  Thus, there is no basis to find that Zhao is the alter ego of KSA and the court declines to do so.

/ / / /

/ / / /

---

[67] Trial Tr. Day 2 at 185:7-13.

[68] Pl. Exh. 99 at 6:9-11; Pl. Exh. 100 at 6:6-8; Pl. Exhs. 75-77, 79-80, 82

[69] Trial Tr. Day 2 at 154:9-156:9.

[70] Trial Tr. Day 2 at 156:10-12; Trial Tr. Day 3 at 56:7-19.

[71] The court understands Zhao's rationale for creating Xin Han.  However, he could have achieved the same result by simply giving Xin a security interest in the planes owned by Xing Kong.  It seems inherently inequitable that Xing Kong's assets can be shielded from liability simply by transferring them to an entity that is separate in name only.

1

**CONCLUSION**

2

For all of the foregoing reasons, Plaintiff is entitled to entry of a judgment against

3

KSA, Defendant Yoon, Xing Kong and Xin Han in the amount of $260,514.18.  Plaintiff

4

shall submit a judgment consistent with this memorandum decision.

5

***END OF MEMORANDUM DECISION***

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Adversary No. 20-4021 CN

## **COURT SERVICE LIST**

All recipients are ECF participants.